IN RE ESTATE OF JOHN R. BARNES, Deceased.

WILLS: Testamentary Power—Deductions from Share—Complaint 1 by Devisee. A devisee must take a devise just as the whim of testator directs it to be taken. Devisee may not insist that the claim which testator has directed to be deducted from his share is a claim for which he is not liable to testator. In such case, the simple question is whether the proposed deduction is embraced within that language of the will which directs what shall be deducted. So held where the will directed that "all notes and other evidences of indebtedness" should be treated as "advancements" and deducted, and where testator held devisee's guaranty of a debt of her husband's, and where she claimed that the guaranty was signed by her without consideration.

DESCENT AND DISTRIBUTION: Advancements—Gift to Son-in-2 Law as Advancement to Daughter. *Arguendo*, it is stated that a gift of property to a son-in-law by the parents of the wife will, ordinarily, be treated as an advancement to the wife.

DESCENT AND DISTRIBUTION: Advancements—Presumption. In 3 the absence of clear and convincing evidence to the contrary, it will be presumed that a parent who, during his lifetime, makes a substantial gift to one of several children, intended such gift to be an advancement.

*Appeal from Mahaska District Court.*—HENRY SILWOLD, Judge.

THURSDAY, JUNE 29, 1916.

THIS is an appeal from an order of the district court sustaining objections to the final report of the executor of the estate of John R. Barnes, deceased. The executor sought

to deduct the sum of $3,714.20 from the distributive share of the objector. The objections were filed by Mary B. Lackey, daughter of said deceased. The executor filed what he denominates an equitable answer to the objections, in which he asks that the matter be tried in equity and transferred to the equity side of the calendar for trial. We find no record in the abstract of an order so transferring the proceedings, but the title page of the abstract recites that the case is in equity. The executor appeals. *Reversed and Remanded.*

*W. H. Keating,* for appellant.

*Irving C. Johnson* and *Philip Sterling,* for appellee.

PRESTON, J.—We think it is not very material whether the case was tried in equity or as a probate proceeding. Deceased died April 22, 1912. His will, executed July 2, 1907, was duly admitted to probate, and I. W. Clendenon was appointed executor. The first paragraph of the will creates a trust for the benefit of the wife of deceased, should she survive him, but in case of her prior death, the trust property was to go to the same persons as provided in paragraph 4 of his will. Paragraphs 3 and 4 are as follows:

"Third: I hereby will, devise and bequeath to my beloved son, Edmund A. Barnes, the undivided one fourth of all my farm, on which he is living at this time, in Section No. 28, Township 75 North, Range 17 West of 5th P. M., in Mahaska County, Iowa, to be his absolutely, in fee simple, in addition to what I shall hereinafter bequeath him; I also will, devise and bequeath to him the undivided one half of all the stock, machinery, and personal property on the farm at the time of my death to be his absolutely. All the bequests made by this third division of my will are not advancements in any event, and whatever claims or indebtedness of every kind and nature I may have or hold against my said son, Edmund A. Barnes, shall not be offset against the above bequests or any of them; but all of the above bequests are gifts absolutely to my said

son, free from any and all claims. debts or evidences of indebtedness I may have or hold against him.

"Fourth: I hereby will, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed, to my beloved children: Edmund A. Barnes, Andrew T. Barnes, my sons; my daughters, Nell B. Clendenon and Franc B. Hull; my sons, Fred L. Barnes and John R. Barnes, and my daughter, Mamie B. Lackey (these being all my children), to be equally divided among them, sharing equally and share alike, except, however, any and all notes and other evidences of indebtedness, if any, that I may hold at the time of my death, against any or all of my said children, the same are to be treated as advancements and set off against the share of said child or children in and to the property bequeathed and devised by this fourth division of this, my will, in order that each and all of my said children may be treated equally and alike in the division of the property included in this fourth paragraph or division of this my will."

The wife died first. June 10, 1905, B. D. Lackey, the then husband of objector, Mary B. Lackey, gave two notes in the following form:

"$1,500.00.            Oskaloosa, Iowa, June 10, 1905.

"On or before six months after date we promise to pay to the order of Mahaska County State Bank, at its Banking House in Oskaloosa, Iowa, with six per cent interest from date, Fifteen Hundred Dollars, together with a reasonable attorney's fee in case suit is commenced for collection of this note. The holder of this note is hereby authorized to extend the time of payment of the same by reception of interest in advance or otherwise without impairing our joint or several liabilities. If the holder of this note is willing we consent that a justice of the peace shall have jurisdiction for collection of same. Interest when due to bear eight per cent per annum.

"B. D. Lackey.

"Due December 10, 1905.   No. 25612."

Indorsements on back of note as follows:

"Without recourse on us pay to John R. Barnes or order. Mahaska County State Bank, by John R. Barnes, Cashier.

    April  7, 1907, Paid on within note.... $100.00
    April  4, 1908, Paid on within note.....    5.00
    Dec.   1, 1908, Paid on within note....   12.50
    April  6, 1909, Paid on within note....   12.50
    May   1, 1910, Paid on within note....   12.50"

"$1,142.00          Oskaloosa, Iowa, June 10, 1905.

"On or before six months after date we promise to pay to the order of Mahaska County State Bank, at its Banking House in Oskaloosa, Iowa, with six per cent interest from date, Eleven Hundred and Forty-two Dollars, together with a reasonable attorney's fee in case suit is commenced for the collection of this note. The holder of this note is hereby authorized to extend the time of payment of the same by reception of interest in advance or otherwise without impairing our joint or several liabilities. If the holder of this note is willing, we consent that a justice of the peace shall have jurisdiction for collection of same. Interest when due to bear eight per cent per annum.

                                         "B. D. Lackey."

Five payments, amounting to $142.50, were indorsed on the back of each note, the dates and amounts being the same. Both notes were also indorsed: "Without recourse on us, pay to John R. Barnes, or order. Mahaska County State Bank, by John R. Barnes, Cashier." Deceased was the cashier of the bank at the time these notes were given. After deceased had taken up the two notes just referred to, and on August 24, 1905, B. D. Lackey gave a new note, the payment of which was guaranteed by his wife, who is the same person as Mary B. Lackey, the objector. The note is in the following form:

"$2,675.00. 　　　　　　Oskaloosa, Iowa, Aug. 24, 1905.

"For value received on or before December 10, 1905, I promise to pay to the order of John R. Barnes, at the office of Mahaska County State Bank, in Oskaloosa, Iowa, the sum of Twenty-six Hundred and Seventy-five Dollars, with interest at six per cent from date hereof, together with a reasonable attorney fee in case suit is commenced for the collection of this note. The holder of this note is hereby authorized to extend the time of payment of the same by reception of interest in advance or otherwise without impairing the obligation of the maker or endorsers or guarantors of this note. All interest, if not paid when due, shall bear interest at the rate of eight per cent per annum.

"This note is made to John R. Barnes for the purpose of securing him harmless by virtue of his having endorsed two notes for me (B. D. Lackey) in favor of the Mahaska County State Bank; one for the sum of $1,142, dated June 10, 1905, due December 10, 1905, being bank No. 25611, and one for $1,500, of date June 10, 1905, due December 10, 1905, bank No. 25612; both of said notes are payable to the Mahaska County State Bank and draw interest at the rate of six per cent per annum from date, and if interest is not paid when due the same to bear interest at eight per cent per annum. Both of said notes being endorsed 'John R. Barnes.' All payments made by me on said notes to said bank shall be the same as though made on this note, and the payment of said notes, with interest as therein provided, by me shall cancel this note. But all sums and interest of said notes or the renewals thereof, should they be renewed, and all extensions made on said notes with interest remaining unpaid, and all principal or interest on said notes paid by the said John R. Barnes or his legal representatives, is secured to him by this note, and that the renewal and extensions of said notes herein described shall in no wise affect my obligation on this note for any unpaid balance remaining on said two notes not paid by me, together with the interest thereon, and all costs and

expenses created thereon against me, including attorney fee should suit be brought on either or both of said notes. And my failure to pay said notes, or any part thereof, this note, after allowing such payments as I may have made on said two notes, shall be and remain in full force and effect as against me for the benefit of the said John R. Barnes, his legal representatives or assigns. I hereby waive notice of demand, non-payment and protest of the two notes above described and of this note, and a failure of said bank or its legal representatives to make demand, or to give notice to me of the non-payment and protest of said notes and for all extensions of time or renewals thereof, shall in no wise affect the conditions of this note, but the same shall be a subsisting and valid obligation against me for said two notes or the renewals or extensions thereof with interest, attorney fees and costs for the full amount thereof, or for any sums remaining unpaid by me thereon.

"B. D. Lackey.

"Attest:—W. H. Keating.

"For value received, I hereby guarantee payment of the within note, waiving time, notice of non-payment and protest. Also, waiving demand, notice of non-payment and protest of the two notes described herein for which this note is given as a protection to the said John R. Barnes for his endorsement on said notes to said Mahaska County State Bank. I further waive any notice of extension or renewal, transfer or assignment of said two notes, or either of them, or their presentation to me for their payment, or either of them, or this note, and the failure to present said two notes, or either of them, or this note to me for payment or the extension or renewal of said two notes and the assignment and transfer thereof shall in no wise in either of these events affect this, my guarantee thereof.

"Mrs. B. D. Lackey."

Five payments, amounting to $285, were indorsed on the back of this. For some time before the death of John R. Barnes, he was in poor health, and W. H. Keating was looking after his affairs. On December 15, 1911, the objector, Mary B. Lackey, wrote Mr. Keating the following letter:

"Philadelphia, Penn., December 15, 1911. Captain W. H. Keating, Oskaloosa, Iowa. Dear Captain:—I know you used to look after my father's affairs and believing you are still doing so, I want to write you in reference to a matter. I remember signing an assignment of my interest, whatever it may be, in father's estate, when I was home one time, about six years ago. You remember that you prepared the paper and had me sign it in your office. It was when father was very ill, the first stroke he had, I believe. I made an assignment of my interest to the extent of $3,000, which was the amount Mr. Lackey had borrowed in 1903 from the Mahaska County State Bank, of which father was the cashier at that time. Later on, when father resigned as cashier, my recollection is that the bank took father's own personal note and endorsed over to father Mr. Lackey's note which they held for me, $3,000. I would like very much to see this indebtedness fully discharged and to that end will you kindly let me know just how much is due, interest and all, and let me have a copy of the note which the bank endorsed to father, and also a copy of the paper which I signed, assigning my interest in father's estate to the extent of this debt. Will you please let me have this information and copies as soon as you can, and oblige, Yours very truly, Mary Barnes Lackey."

On December 31st, she wrote the executor the following letter:

"Philadelphia, Penn., Dec. 31, 1912. Dear Clen:—I am enclosing a letter to you, from my attorney, Mr. A. H. Powden, of Lancaster, Penn., who used to be a partner of Bert's and knows him well, and if anyone can collect the money on these notes, I know he can, and I think after reading his letter to me, you will think he is treating me fair and square. He

says he won't charge me anything at all if he doesn't get the
money and if he does it will be 10 per cent. How much will
that be? And I know attached to the notes, Bert agrees to
pay for collection, so that will come out of his pocket later,
won't it—the $50.00 Mr. Powden needs to start this fight?
I suppose the estate will advance that to him at once, and
his fee of 10 per cent, if he does get the money—will that
come out of my share of the estate, or how will that be paid?
When John wrote me a week or so ago, this is what he said
in part: 'I don't understand about Mr. Keating telling you,
that your note would take all your interest. He will do all
he can to see that you get your money back on the note. He
is a good man, but he has his figures too low on the estate.
With the factory stock, bank stock and farm, I think it would
be about seven thousand at least.' So I thought it best to let
Mr. Powden know, and to give him all information about
Bert's being in the city, etc., which I got from good authority
and know it to be the truth, how he is living while here. I
certainly will keep quiet on this, for I know it is best, and I
surely hope Mr. Powden gets it. It seems he is also going
to try to get my back money and bring Bert up to his original
agreement of $150 a month, which he made of his own free
will. Bert owes me $25 for September, $50 for October,
November and December, to date, $175. My check for $50
is due tomorrow, January 1, 1913, as that is all I get since
he cut my allowance in two, and Mr. Trinkle allowed him
to do so, but I didn't sign anything releasing him. I see that
Mr. Powden has forgotten to sign his name to his letter, but
it was an oversight on his part, I know, and I suppose it is
all right. You had better send the papers he wants to him
direct, instead of through me, so as to have no delay, for I
do not know how long Bert will be here in the city. I heard
that he was to be here a month, and that is up now, so I
see why Mr. Powden is in a hurry. Having been Bert's part-
ner while in Williamsburg, Penn., several years ago, under

the firm name of 'Lackey & Co., Brokers,' is how Mr. Powden has the enclosed check in his possession. But I know that Bert paid $25 as late as April or May, 1910, for after I came back from mama's funeral—(Franc, John and I had gone over the notes with papa's permission)—and I insisted when I got back that he must try to keep up the interest, which he could have done by only paying $16 a month, so he sent $25. I think that Mr. Keating had him credited with it on the copy of the notes which he sent me quite awhile ago. I know you will have Mr. Keating send Mr. Powden this desired information at once, with the original notes for collection, and don't forget to return him that check. Let me hear from you, and if this meets with your, as well as Mr. Keating's approval? Hoping you are well, and wishing you every success and happiness for the New Year, I am, lovingly, Mary.''

"Lancaster, Pa., Dec. 30th, 1912. Mrs. Mary B. Lackey, Phila, Pa. Dear Mrs. Lackey: Have carefully read the portion of the letter addressed to Mrs. Powden intended for me, and in view of the fact that your former husband is back in Philadelphia, and in the jurisdiction of the courts of Pennsylvania, and the further fact that he is now engaged in raising capital for and organizing a new company to do business down in Texas, and must either have the money himself or is associated with others who have it and are putting it up, otherwise he could not be riding around in an automobile, and living at such swell apartments as the Delmar-Morris, and giving theatre parties and dinners, and his present wife loaded down with furs and diamonds, compels me to advise you that now is the time, if anything is to be recovered to act and to act quickly. This is what I want you to do. I do not want you to tell Mr. DeLong or anybody else that your interest in your father's estate as written to you by your brother will be $7,000 instead of all being eaten up by Mr. Lackey's notes, as you can depend all such information is carried back to B. D. Lackey. Please do not discuss your

affairs with anyone except the members of your own family, Mr. Keating and myself. In the second place I want you to write to your brother-in-law, Mr. Clendenon, the executor of your father's estate, and have him send me at once a power of attorney to represent your father's estate in the collections of the notes, together with interest, of B. D. Lackey, have the interest computed to date, and send me the original notes and a statement all figured out to date of the exact amount due. Also send me a check of $50 for expenses, as we cannot start to fight without something in hand to fight with, and in order to be frank so you can understand as to my time and legal knowledge I am willing to take my chances with you as to whether or not either one of us recover or receive any money from B. D. Lackey, but I could not afford or be expected to put up the money, which must be done in advance for costs and expenses. I will then come to Philadelphia as soon as I receive these and you can depend I will either get the money or no one else will. I think you know me well enough that when I go after a person I always go prepared and I get them. In case I recover the money on the notes my fee will be ten per cent; in case I do not recover, I shall not charge you anything. I want you to send this letter to your brother-in-law when you write him, and he no doubt will go over the matter with Mr. Keating, which I would like to have him do, as Mr. Keating will more fully understand my reasons for acting now. Or if you wish to retain a copy of my letter you can copy it and send either the original or a copy of it to Mr. Clendenon, as you prefer. Also advise me when and how much B. D. Lackey sends you this month, and how much is due you on the original agreement of $100 a month. I trust I have made everything plain to you, but wish to caution you again to refrain from discussing your affairs with anyone except your folks at home, Mr. Keating or myself. Do not in your innocent way tell any of your acquaintances in Philadelphia that I am going after B. D. Lackey, as a bird in the hand is worth two in the bush, and

I want to get the bird before a flight and we got him in Pennsylvania. Trusting to hear from you and that you will observe and approve what I say, I remain, Sincerely yours,

"P. S. In Pennsylvania, unless a debt is acknowledged or paid within six years, it is barred by the statute of limitations, or in plain words outlawed, and you cannot recover. By acknowledging it, I mean such as the payment of interest, and that would carry it six years from that time. In looking into the matter, I found the check given to your father by B. D. Lackey, Dec. 11th, 1908, for $25, this would be sufficient to carry it until 1914. I do not know whether he has paid any interest on it since then or not. I am enclosing check, which is very good proof. You may send it along with the letter for the inspection of Mr. Keating, and return it to me with the other papers when they forward them. Respectfully yours,"

So much of the testimony as appears to be material to the determination of the questions presented will be referred to. The executor testified that he sent to the objector, who lives in Philadelphia, a copy of his partial report, including the note and interest, which he claimed was against her share of the estate, and at the same time sent a check in the sum of $710.80, which was the difference between the amount of the note and the amount of the distribution made at the time; that she acknowledged the receipt of the papers and the check, and returned a receipt for the same. The check was indorsed and cashed by her. When final distribution was made, another check, dated April 28, 1914, in the sum of $692.30, was sent to her by the executor, which was indorsed and cashed by her. These checks, together with certain corporation stock which was sent to her and retained by her, were the amount of her share in the estate, after the notes, or alleged indebtedness by her, were deducted from her share. The bank stock and the saddlery stock were sent to Mrs. Lackey at the same time as the last check, or at a time prior thereto. In making the deductions, the executor deducted the amount of the note,

less interest.   She has retained the money referred to in the two checks.

The executor further testified that the original notes, before referred to, were in possession of the estate at the time he became executor; that he sent them to Mrs. Lackey either in December, 1914, or when he sent her the last check; that he never tried to collect the notes for the estate, but tried to collect them for her from her husband by her order; that Mrs. Lackey obtained a divorce from her husband before her father died.   Mr. Keating testified that he represented John R. Barnes in his lifetime in relation to the two notes referred to in the new note; that he, John R. Barnes and Mrs. Lackey, were present when he drafted the new note.   He states that the conversation at the time the note was given, was as follows:

"Mr. Barnes, the father, said to the daughter, 'I hold two notes against you people; you are living too extravagant; you want to learn to save your money; your husband is getting a large salary and those notes must be paid; I am probably on my death-bed, and I want my children to share as near equally in my property as possible, and if your husband don't pay those notes, you and he together save up and pay those notes, then I must deduct the amount of them from your interest in my estate.   I would like to fix this note or property in such shape as to as far as possible compel your husband to be more careful in the use of money, and you ought to be more careful.   You are both young and your husband is getting such a salary that instead of living at the height of extravagance, as you do, you could pay these notes in a year or two easily and take care of everything, and I insist that you shall do it.   Now, I want Mr. Keating to draw a note, and I want your husband to sign it, and I am going to try and get every dollar of it from him, if I can, and I want you to guarantee the payment of that note, and you must understand that it is to be taken from your share in my estate, and I will not say anything to Mr. Lackey of our conversation, so as to encourage him as far as possible, or

urge him as far as possible to pay this note, but if he does not it will be taken from your share in my estate.' And in pursuance of that conversation I drew the note and presented it to Mrs. Lackey and called her attention to the fact that she would understand it, that when she signed the guarantee that she was waiving her interest up to that amount in the estate of her father; she signed the note and the guarantee in my presence.''

He testifies further that his recollection is that the two notes were assigned afterwards by the bank to deceased; that the conversation and transaction in regard to the new note and guaranty signed by B. D. Lackey and Mrs. Lackey was at the home of deceased while he was lying in bed at the time he had his first stroke; that, though deceased was weak, he was able to sit up, but had not left the house; that he was feeble because he was advanced in years; that witness did not take charge of his business for a year or more after the execution of this new note; that deceased went back to the bank and was in the bank several months after his first stroke, when he was stricken a second time, and witness commenced to do business for him after his second stroke; that the two notes were handed to witness by executor and mailed to Mrs. Lackey some time in July, 1914, at her own request. Witness says further:

''I never represented 'to Mrs. Lackey that her father had endorsed the notes. I wrote the new note. Q. And you stated in there that Mr. Barnes had endorsed that note? A. Well, that was their talk to me at the time. Q. Didn't you have the notes before you at that time? A. No, I don't think so. Mrs. Lackey had the notes when she attempted to make a settlement with her husband; they were sent to her. These two notes were returned to the estate probably two or more months after the death of John R. Barnes. They were returned to me by Mr. Powden, who had attempted to collect these notes for Mrs. Lackey; that is the first recollection of the notes in the estate, and I had charge of Mr. Barnes'

papers from the time of his death to the present time, and I have no recollection of the notes being in the estate until they were recalled from Mr. Powden, and that accounts for the notes being in the possession of the estate, subsequently to the settlement of the estate. I had not been discharged by Mrs. Lackey in relation to attempting to collect the notes and assisting Mr. Powden. That was all the employment I had. I was first informed in relation to these notes that I would not be required to look after them further by Mr. Sterling, who came to my office last summer. Since that time I have not acted for Mrs. Lackey in any way. I had the notes in my possession for her at the time and prior thereto. The estate did not attempt to collect those notes by sending Mr. Hugh McCoy, of Oskaloosa, Iowa, a practicing attorney, to Philadelphia. At that time, Mrs. Lackey was obtaining a divorce from her husband, and her people attempted to save her and not take the amount of these notes from her share of her father's estate, and in order to assist her in obtaining sufficient alimony to pay these notes, Mr. Hugh B. McCoy was sent at the expense of the family to try to get everything they could for her from her husband and make the best possible settlement. The brothers and sisters paid Mr. McCoy individually. Mr. Barnes was living when the notes were sent to Mrs. Lackey. He was deceased when they were returned to me. The notes were sent to Mrs. Lackey in the first instance sometime about December, 1911. I think those notes and the new ones were in my possession and kept together at the time, December, 1911. I was representing Mr. Barnes and was not representing Mrs. Lackey.''

No evidence was offered on behalf of the objector, except that, as a part of the cross-examination of Mr. Keating, she offered a part of the supplemental final report of the executor, showing the note of B. D. Lackey, dated August 24, 1905, and the guaranty of Mrs. Lackey. This report contained copies of the note, which have heretofore been set out. Mr. Keating had testified that he prepared the supplemental final report.

In the final report, the executor had deducted the amount due on the new note which had been guaranteed by Mrs. Lackey, the objector. The objections filed by Mrs. Lackey to the final report were on the following grounds:

"That said executor in said report has charged to her a note executed by B. D. Lackey and amounting at the time of the said report to the sum of $3,714.20. This objector states that said, note should not be charged to her, for the reason that she did not execute the same, and that it was not a note or other evidence of indebtedness that the said decedent held at the time of his death against this said objector, but was the personal debt of B. D. Lackey, and that no part of the consideration passed to this objector. That if said note be uncollectable, the loss should fall equally upon all of the residuary legatees and not upon her alone. She denies that she was surety on the note of B. D. Lackey, and states that, when said note was executed by the said B. D. Lackey, it was executed by him alone, and not by his objector in any manner."

The executor's so-called equitable answer to these objections is quite lengthy, and recites substantially all the facts which we have set out, and some other matters. One part of the answer is the claim that, at the time of the execution of the guaranty by Mrs. Lackey, she agreed to and accepted said indebtedness as her own, and consented and agreed that, if her husband did not pay the same, it should be deducted from her interest in her father's estate; that the contract of guaranty was made in part for the benefit of Mrs. Lackey in assisting her in compelling her husband to pay the note; that the debt was, in fact, her debt, and held against her interest in the estate of her father; and that, therefore, the execution of said guaranty, and her promise to pay the debt, in the manner before stated, was not the promise to pay the debt of Lackey, but her own debt, which her father recognized as due from her to his estate in order to equalize the shares of his children; that, because of these matters, she is barred and

estopped from claiming that said indebtedness is not her own.

They also plead that the original notes were used to assist objector in her divorce proceedings against her husband, in an effort to compel him to make payment to her of sufficient money to pay the note, or turn over property to her for that purpose. It is also pleaded that, subsequent to the making of said note and after it became due, deceased made his will, in which he provided for the payment or the deducting of all evidence of indebtedness, and that such indebtedness should be considered as advancements; that, immediately after the death of said John R. Barnes, Mrs. Lackey requested the executor to send the original notes to her attorney, Powden, for the purpose of collecting the same from her husband; that the notes were sent, together with $50 from the estate as a retainer fee; that an attempt was made to collect the notes for her from her husband to save her interest in her father's estate, to all of which Mrs. Lackey agreed, and accepted the provisions and conditions made for her, and directed the attorney as to collecting the same; and that thereby she made the debt her own, and that she is estopped from denying such indebtedness as her own. It is also pleaded that, because the objector accepted the two checks heretofore referred to, and the corporation stock, knowing that the same had been deducted from her share of the estate, she made said indebtedness her own, and thereby recognized her agreement with her father, and that thereby she is barred and estopped from claiming that she is not the maker of said notes, and that the one guaranteed by her is not her debt. It is also pleaded that, by reason of all of the facts and the agreements before set out, the executor, relying upon her statements, conduct and contracts, had paid over the money to the several parties entitled to receive the same, upon the basis of the statements as set forth in his reports, copies of which were sent to her; that he has no funds in his hands with which to pay any excess, because he was led by objector, by the facts before recited, to pay out said money and make

his report in the manner he did; that she is estopped from denying said distribution as made, or denying said indebtedness as against her, and a general equitable estoppel by reason thereof is pleaded against her.

1. Appellee's principal contention in the court below was, and in this court is, that there was no consideration for the new note given August 24, 1905, by B. D. Lackey, and the guarantee thereof by his wife was without consideration, and the trial court made a finding that there was no consideration, and for that reason held that the amount of the note could not be deducted from the share of Mrs. Lackey as an advancement. Appellant's principal argument is also upon this question and to meet the contention of appellee. Appellee's contentions are that the provision of the Code that all contracts in writing signed by the party to be bound shall import a consideration has no application to a case where the consideration is expressed and fully stated in unmistakable language in the written instrument itself (citing cases); that, where the payment of a note is guaranteed subsequent to its delivery, there must be a distinct and separate consideration for such guarantee, and that, after the original consideration is exhausted, there must be a new and sufficient consideration (citing cases). And further, that, in the absence of evidence of a request to forbear, the act of forbearance itself would not indicate that it was in pursuance of a promise to forbear, and the guaranty would be invalid for want of consideration; and that, where the guaranty is solely of a pre-existing debt, it is without consideration and void. We should have stated, in stating the facts, that there was some evidence that deceased was willing to extend the time of the payment of the notes in order that the makers might pay in small installments.

Appellee also argues that the rights of the parties were fixed as of date August 24, 1905, and that on that date deceased had not indorsed any notes, and if any indorsement was to afford any consideration for the execution of the note of August 24th, it must have been on or before that date;

that there is shown no benefit to the debtor in the making of this contract of August 24th, and no detriment to the creditor by its execution; in other words, the claim is that the liabilities and privileges of the parties would have been just the same if the new note had never been executed. They contend, also, that, when the two notes matured, on December 10, 1905, the Mahaska County Bank could have brought an action on the original notes, and would have had the same rights as are sought to be conferred by the execution of the new note dated August 24th; that deceased gained nothing and lost nothing; and that B. D. Lackey gained nothing and lost nothing; so that, if the suit had been brought by deceased or his estate against B. D. Lackey, on August 24th, B. D. Lackey might insist that said note was without consideration; and that, if he were liable at all, his liability was upon the original notes; and they contend that, if the new note was without consideration as to B. D. Lackey, there was no consideration on the part of the alleged guarantor, Mary B. Lackey, because she was guaranteeing the payment of a past and antecedent indebtedness. This indicates, in a general way, the argument and contention of appellee.

Appellant contends, substantially, that the note is not only an evidence of indebtedness, but an indebtedness of the said Mary B. Lackey; and that the amount unpaid was to be deducted from her share in her father's estate, in accordance with the terms and provisions of his will, coupled with the relation and agreements of the parties; that the guaranty, as made by Mrs. Lackey, was an evidence of indebtedness, because she so understood it when she signed the instrument, as shown by the testimony in regard to what occurred at the time of its execution; and that time was extended, and for the consideration that she and her husband should pay $25 per month, or more, until paid; and that the note and guaranty were due before her father's death and were an absolute debt against her, which, by reason of the understanding between her and her father, was not pressed and

was left until his death, to be satisfied from his estate. They also contend that the fact that a note, guaranteed as this note was, found in the hands of the executor of the estate, imported a consideration; that an antecedent or pre-existing debt constitutes value and is deemed such, whether the instrument is payable on demand or at a future time (citing the statute and cases); that she has in her possession the original notes signed by B. D. Lackey, her husband, which represent the original indebtedness, and which she holds against him; and they say that, though the notes were not made by her, they represent an existing indebtedness of both Mr. and Mrs. Lackey which, by the new note, she guaranteed to pay; that Mrs. Lackey recognized her liability on the note, and that she had guaranteed the payment of the debt; that her father had paid the bank and had taken an assignment of the debt to himself; and that, if it was not paid before the death of her father, it would be deducted from her interest in the estate; that Mrs. Lackey nowhere denies the good faith of the transaction; and that her father relied upon the guaranty of the daughter by forbearing to press payment; and they also argue for an estoppel by her conduct and by her accepting the checks, corporate stock, and by other circumstances shown in the record.

　　It seems to us that counsel and the trial court lose sight of the main question in the case, and that is, whether these notes, or any of them, should be considered as advancements and deducted from the daughter's share, under the provisions of the will, and we deem it unnecessary to discuss at any length the question of consideration. Doubtless, it is not an advancement, strictly speaking, where there is a will, but testator uses the word in his will, and the question is whether the amount should be deducted. We apprehend that there may be an advancement by gift without any consideration at all. It is possible that, if there were no question of advancement in the case, and the bank

1. WILLS: testamentary power: deductions from share: complaint by devisee.

or the estate of deceased were seeking to enforce payment by Mrs. Lackey of the guaranty in an action, there might be force in some of the contentions as to consideration, and it may be thought that the attempt of the executor to deduct the amount of the notes from the share of Mrs. Lackey in her father's estate is seeking to enforce payment of it. This may be so in a sense; yet, as stated, it is a question of advancement, or the right of testator to deduct. The property of deceased is his own, and he has a right to do with it as he pleases. If the original notes had been paid off by deceased when, as cashier, he indorsed them to himself, if done at the request of the maker of the notes and for his benefit, deceased could have maintained an action on account for the money so paid, and the notes would be some evidence of the indebtedness due deceased from B. D. Lackey. Or, if deceased had purchased the notes when he took an assignment of them, then the original notes would be evidence of indebtedness. And the new note given by B. D. Lackey and guaranteed by his wife, the objector, agrees to pay that debt, notwithstanding some expressions in the new note, such as that deceased had indorsed the notes, etc. His purpose is clear, that he considered the amount of these notes owed to him and as an indebtedness against both B. D. Lackey and his wife, the objector. The note itself so shows, and the undisputed evidence of Mr. Keating as to what took place between objector and deceased at the time the new note was given.

It is not necessary to determine the rights of the bank, for, without any question of advancement, an attempt had been made to collect the original notes of B. D. Lackey; nor is it material to determine the rights of the parties if Mrs. Lackey were attempting to force payment of the original notes as against her husband; but, as stated, it is a question whether, under the will, which was made after the execution of all these notes, they or any of them should be treated as an advancement and be deducted from the share of Mrs. Lackey in her father's estate. This is to be determined from all the

circumstances in the case, as shown by the evidence, and to our minds it depends very largely upon two main propositions: what was the intention of deceased, and are the notes, or any of them, evidence of indebtedness? By the will, it clearly appears that the devise to his son Edmund, in the third paragraph of the will, shall not be considered as advancements, and the fourth paragraph disposes of the remainder of his estate among his other children, and that they should share equally except that:

"Any and all notes and other evidences of indebtedness, if any, that I may hold at the time of my death against any or all my said children, the same are to be treated as advancements and set off against the share of said child or children in and to the property bequeathed and devised by this fourth division," etc.

And this shall be done in order that his said children may be treated equally in the division of the property included in the fourth paragraph.

It is contended by appellant that the notes were a debt against Mrs. Lackey, as well as her husband, and, taking all the circumstances in the case together, we are inclined to this view. But whether this be true or not, the authorities hold that a gift of property to a son-in-law by the parent of the wife will ordinarily be treated as an advancement to the wife, and whether such gift is intended as an advancement is usually a question of fact under all the circumstances. See a large number of cases in note to *Ireland v. Dyer* (Ga.), 26 L. R. A. (N. S.) 1050. It may be said that deceased did not intend to make a gift of these notes to B. D. Lackey. This may be so, strictly speaking, and yet he seems to have considered the collection of them doubtful, and his purpose clearly was that, if they were not paid by B. D. Lackey, then his daughter should deduct the amount thereof from her share in his estate. If he considered them worthless as against the son-in-law, and had no disposition to attempt

2. DESCENT AND DISTRIBUTION: advancements: gift to son-in-law as advancement to daughter.

to collect them as against him, the effect would be the same, so far as he is concerned, as a gift of them to him. Mrs. Lackey herself understood all this and consented to it. Furthermore, her letters, her acceptance and retention of the checks sent to her and the corporation stock, her agreement and conduct, as testified to by Mr. Keating, which is undisputed, and the other circumstances in the case, show that she herself construed the transaction as we do, if, indeed, she is not estopped, as contended by appellant, by her acts and conduct, from now claiming that it was not her debt and that it should not be deducted. It is quite clear to us that either the two original notes or the new note, taken by themselves, or taken together, as we think they should be, are clearly evidence of indebtedness, and that it was the intention of deceased to treat such indebtedness as an advancement to his daughter, Mrs. Lackey, and that the amount of the debt should be deducted from her share in the estate. We shall not repeat the circumstances, before set out, which convince us that such is the case, but content ourselves with stating our conclusions from the entire record. The controlling element in determining whether a given transaction between a parent and his child will be considered an advancement, or only a gift, or perhaps a loan, or a transfer for a valuable consideration, is, as has been heretofore observed, the intention of the donor at the time of the transaction. The evidence to establish that intention must be drawn largely from the circumstances surrounding the persons interested at the time. And the circumstances surrounding the transaction, or in truth the mere gift by a parent to a child, may be such as to create a presumption of advancement. For the doctrine that a parent desires to distribute his estate equally among his children is so strong that, in the absence of clear and convincing evidence to the contrary, it will be presumed that a parent who, during his lifetime, makes a substantial gift to a child, intended such gift to be an advancement. 1 R. C. L. 668.

3. DESCENT AND DISTRIBUTION: advancements: presumption.

True, in the instant case there is a will; but by its terms, as we have already stated, we think it was clearly his intention that the indebtedness before referred to should be treated as an advancement to his daughter, or rather, deducted from her share. We can imagine circumstances under which the parent of a daughter would feel that it would be to the advantage of the daughter to make the advancement to the daughter's husband; he may have such confidence in the son-in-law, because of his being a good business man, or something of that kind, and because of his daughter's being inexperienced in business, as to believe it would be to her advantage and to her interest to make an advancement to the son-in-law.

We are of opinion that the trial court erred in sustaining the objections and refusing to deduct the indebtedness from Mrs. Lackey's interest. The cause is, therefore,—*Reversed and Remanded.*

EVANS, C. J., DEEMER and WEAVER, JJ., concur.