IN THE MATTER OF THE ESTATE OF FRED JAN-
SEN, Deceased; ELMER JANSEN,
*Respondent and Appellant,*

vs.

CLARA ACKERMAN, MARTHA JANSEN, FLOR-
ENCE JOHNSON, JOSEPH G. JANSEN, ED-
WARD JANSEN, SYLVIA BOUSKA, LUCILE
HOFFMAN, NORBERT JANSEN, and FREDER-
ICK JANSEN,
*Petitioners and Respondents.*

(No. 2672; June 21st, 1955; 284 Pac. (2d) 1086)

For the appellant, the cause was submitted upon the brief and also oral argument of Raymond B. Whitaker of Casper, Wyoming.

For the respondents, the cause was submitted upon the brief and also oral argument of Fred W. Layman of Casper, Wyoming.

## OPINION

RINER, Chief Justice.

A final order made by the District Court of Natrona County in the matter of the estate of Fred Jansen, deceased, is the cause of bringing this direct appeal before us. The ruling of the district court which decreed the sum of $6,211.91 to be an advancement to Elmer Jansèn as one of the ten heirs of Fred Jansen, deceased, in the proceedings brought to settle and distribute his estate constitutes the subject of this litigation. Neither of the two presiding judges of the Seventh Judicial District sat in the disposition of this matter, but the presiding judge of the Sixth Judicial District was summoned to sit in their stead.

Hereinafter, we will refer to Elmer Jansen as the appellant and the other heirs of Fred Jansen as the petitioners who sought the order above-mentioned or as the respondents.

We may at this point observe that the facts and circumstances are practically uncontroverted with the result that the question presented is substantially one of law. These facts and circumstances, as we view them so far as important to be considered, are as follows:

Fred Jansen, the father of these children mentioned above, died intestate on February 5, 1952. These nine people (all additional children of decedent—Elmer Jansen constituting the tenth) are the respondents in this matter. The deceased left an estate totaling in value approximately thirty-six thousand dollars. As admitted by the pleadings herein, Fred Jansen prior to his decease was the owner in the Wyoming National Bank of Casper, Wyoming, of an account in the sum of $6,211.91. On September 21, 1951, Fred Jansen transferred this account from an open account in the same bank so as to constitute it a joint account in the name of Fred Jansen, Katharine (as Mrs. Elmer Jansen), or Elmer J. Jansen. A motion was made by Elmer Jansen in the court below to dismiss the petition of the other heirs on the grounds that it failed to state sufficient facts to constitute a cause of action. This motion was heard by the court on April 7, 1954, was overruled, and omitting formal recitals, the final order made is that appealed from, and reads:

"Comes now this 7th day of April, 1954, and the parties appearing in person and represented by counsel and announcing themselves ready for trial, the hearing of said cause was proceeded with and after hearing the evidence and the argument of counsel, the COURT FINDS:

"That the sum of $6,211.91 transferred by Fred Jansen, now deceased, to Elmer Jansen and Kathryn, his wife, on September 21, 1951, in a joint account in the name of Fred Jansen or Elmer Jansen or Mrs. Elmer Jansen, and which account was so outstanding on the date of death of Fred Jansen, deceased, to-wit: on February 5, 1952, and by the terms of said contract made with the,

Wyoming National Bank of Casper, wherein the said joint account was set up, the said sum belonged to the said Elmer Jansen and Kathryn Jansen, jointly upon the death of the said Fred Jansen and that the said sum was thereafter withdrawn by the said Elmer Jansen and Kathryn Jansen and that the said transfer so made by the said Fred Jansen constituted an advancement to the inheritance of Elmer Jansen from the Estate of Fred Jansen, deceased, and that the said sum shall be charged against the inheritance of the said Elmer Jansen from the said Estate of Fred Jansen, deceased,

"NOW THEREFORE, IT IS BY THE COURT ORDERED, ADJUDGED AND DECREED: that the sum of $6,211.91 be and the same is hereby decreed to be an advancement to the said Elmer Jansen by the said Fred Jansen and that the said sum shall be charged against his inheritance from the Estate of Fred Jansen, deceased.

"IT IS FURTHER ORDERED that the costs incurred by the respective parties in the hearing of the above entitled cause be borne by the respective parties."

Fred Jansen, the father, in the course of his several visits to Casper from a farm he had in Nebraska, on numerous occasions requested Elmer to accept remuneration for the work he had previously done in looking after the several properties owned by the father in Casper and managing them over a period of many years. As a matter of fact, Elmer and his wife looked after, managed, maintained, leased, and collected rentals on these certain properties owned by decedent in Casper, Wyoming, from 1936 to the date of the father's death. The following testimony given by Elmer Jansen stands in the record, as it seems to us, uncontradicted:

"Q. Yes, relate what it was. A. The next morning after breakfast he (Fred Jansen, the father of Elmer) said, 'Will you go up to the bank with me and we'll get this money straightened out?'

"Q. Did he say anything else? A. He said, 'Would you sign for me?' I said yes. 'Well,' he said, 'Let's go down there,' so we went down and Kathryn went with us.

"Q. That is your wife? A. That's her. So when we got down there we went to Mr. Barton and he told us to go to Mrs. Lewallen and she would fix us up.

"Q. Mr. Barton is the president of the Wyoming National Bank? A. Yes. So we went to Mrs. Lewallen.

"Q. Was it the Wyoming National Bank?˙ A. Yes. And we went to Mrs. Lewallen and told her what we wanted, and she says to dad, 'It that what you want?' And he said yes. So we went ahead and fixed it up, and—

"Q. Now, did all of you sign something at that time? A. We all signed this card, yes. (Fred Jansen, Mrs. Elmer Jansen, and Elmer J. Jansen.)

"Q. Did all of you read the card before you signed it? A. Yes, we all read it, and Mrs. Lewallen read it for dad's benefit. And then we all signed, and when it was finished she handed the book to dad, dad handed it to Kathryn, and Kathryn says, 'What will the rest of the kids think about this?' And he says, 'It's none of their business.' Then Kathryn says, *'Don't you think you ought to take a check book along?'* and he says, *'No, if I need money you can send it.'* (Italics supplied.)

"Q. *'You can send it?'* A. *Yes.* (Italics supplied.)

"Q. To whom did he say that? A. To all of us right there in Mrs. Lewallen's booth.  *  *  *

"Q. Was the card that you signed, or whatever you signed there, taken by your father, your wife or yourself, or was it left at the bank? A. It was left at the bank.

"Q. Handing you Respondent's Exhibit F for purposes of identification I ask you if you can identify what that is? A. That is a savings account bank book.

"Q. Is that the pass-book? A. The pass-book at the Wyoming National Bank.

"Q. Where did you first see that particular book? A. When we got to the bank.

"Q. Is that the book that your— A. That's the one he brought with him.

"Q. Is that the book that Mrs. Lewallen handed to your wife? A. Yes, this is the book she gave us that day.

"Q. Who kept that book in their possession after that? A. We did.

"Q. You and your wife? A. Yes, after dad handed it to Kathryn she kept it.

"Q. Now, was that book ever in your father's posession after leaving the bank? A. No.

"Q. Did you discuss at the time that you executed the card, or whatever you signed at the bank, Mr. Jansen, anything about your survivorship? A. No.

"Q. I don't think you know what I mean by the term 'survivorship.' Did you discuss what would happen to the money in the event of the death of one of the parties who signed that card? A. Well, just in signing it, that the other two, it would go to them, you know.

"Q. It would be their property? A. It would be their property, yes.

"Q. Was the word "advancement' used at all? A. No, no.

"Q. At any time in discussion with your father and

160

you relative to this bank account was the word 'advancement' ever used? A. No.

"Q. Did your father state to you at that time, or at any time, that this transfer of money was to be any part of your share in his estate? A. No.

"Q. Was his estate discussed at that time even? A. No. * * *

"Q. Now, Mr. Jansen, directing your attention to page denominated and indicated as Page 1, with the big number one on the face of the page, located approximately in the center of the page, and under the column dated September 21, 1951, and then the initials 'LL' and the amount $6,211.91, what is that? A. That's the amount of money that was in his checking account.

"Q. I see. And that was the money that was deposited that morning in this joint account? A. Yes, it was transferred from the checking to this.

"Q. Now, what are the figures opposite the word February 15, '52? A. January, '52, interest.

"Q. That is interest on the account? A. Yes. $38.82.

"Q. Now directing your attention to the bottom of Page 2, the page indicated by the large figure two located approximately in the center, which is below the page in the book to which we have just referred, were the words 'No payments can be made or money withdrawn without presentation of this book,' which are printed thereon on that book, when you received it? A. Yes. Yes. * * *

"Q. Are they still on there? A. Yes. * * *

"Q. Now, directing your attention to Respondent's Exhibit G. for identification, I ask you what that is. A. This is the transfer from the three names—my dad's and mine and Kathryn—to just Kathryn and mine.

This is the transfer when we took it out of—

"Q. When did you do that, Mr. Jansen? A. February 15, 1952.

"Q. Is that the way the account is at the present time? A. Yes, that's the way it is now. * * *

"Q. What is Respondent's Exhibit G? A. It's a savings account book, the Wyoming National Bank.

"Q. And in whose name is that savings account? A. Mr. or Mrs. Elmer J. Jansen.

"Q. From what account or place was the money in that account derived? A. From the account of Fred Jansen, Mr. Elmer Jansen and Mrs. Elmer J. Jansen.

"Q. As indicated in Respondent's Exhibit F? A. Yes. * * *

"Q. Mr. Jansen, did you tell any of your brothers and sisters about this account? A. No. No.

"Q. I forget whether I asked you or not about any conversation at the bank with your father relative to your brothers and sisters. A. No, only what he said, 'It's none of their business.'

"Q. Was that the reason why you didn't tell them? A. No. I didn't think he wanted it told. Dad talked very little about his financial—.

"Q. Yes. How many pieces of property does your father own in Casper, Wyoming? A. Four, at one time.

"Q. And how many pieces of property did he own down in Nebraska? A. He had two farms and this five-room house in town, and then three store buildings.

"Q. Did your father, to your knowledge, ever work for anyone else? A. No, never for a corporation, but we did contract up here.

"Q. Yes. How did he acquire this property? A. Just working and buying it; paying for it.

"Q. Was your father well educated, Mr. Jansen. A. No, not in schooling.

"Q. Did he seem to be an intelligent man? A. Yes, sir.

"Q. Did his intelligence have the respect of all his children? A. Yes, sir.

"Q. And of people with whom he did business? A. Yes.

"Q. Did he seem to be an astute businessman? A. He knew business, yes.

"Q. Now, did you ever state to your brothers and sisters that your father didn't owe you anything? A. Yes, I did.

"Q. Would you explain to the Court your feeling about that? * * * A. Well, I don't believe he owed me anything; no.

"Q. Well, upon what do you base that? A. Well, we worked together for years, and I stayed with him until I was 29 years old, until I was married, and worked with him. And we could handle bigger jobs by the two of us working together, and I thought that this work up here that I did for him was nothing, that I could do for him for nothing. * * * THE COURT: State it again so we get it straight. A. I felt that anything I could do for him I wouldn't charge him for it. I, you know, there wouldn't be no charge on it.

"Q. You never did send him a bill, did you, Mr. Jansen? A. Oh, no, no.

"Q. You never charged him ten per cent of the rent you collected for him, did you? A. No."

A reasonable compensation for the work which El-

mer and his wife did in connection with these properties owned by the father in Casper would be about $7,130.37. As indicated above, Elmer and his wife collected rents on these properties in Casper — which amounted to the sum of $14,592.25, as disclosed by their account cards. This entire amount was all remitted by them to his father in Nebraska after the bills which accrued in connection with the properties were duly paid.

It would appear that respondent seemed to rely solely upon the mere fact of the transfer of the money in the Wyoming National Bank from the open account to the savings account as creating an advancement under the doctrine of presumption. The significant part of the bank card which Elmer, his wife, and his father signed after they had arrived at the Wyoming National Bank reads:

"JOINT ACCOUNT AGREEMENT—PAYABLE TO EITHER OR SURVIVOR

"We agree and declare that all funds now, or hereafter, deposited in this account are, and shall be our joint property and owned by us as joint tenants with right of survivorship, and not as tenants in common; and upon the death of either of us any balance in said account shall become the absolute property of the survivor. *The entire account or any part thereof may be withdrawn by, or upon the order of, either of us or the survivor.*

"It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our *heirs, next of kin,* legatees, assigns and *personal representatives.*

DATE                    /s/  Fred Jansen
9-22-51                 /s/  Mrs. Elmer Jansen
                        /s/  Elmer J. Jansen."

(Italics supplied. )

Elmer also testified on rebuttal:

"Q. Now, when that sum of $6211.91 was transferred, you didn't have that same feeling about refusing it? A. It was his wish then, and I went through it. He asked me to sign it and I signed it." This testimony does not seem to have been disputed.

From a careful examination of what occurred when the card was signed by Elmer, his wife, and his father at the Wyoming National Bank and the explanation given all three of these people by the official of that bank who supervised the execution of the card, it will be observed that Fred Jansen, after he had advised the bank official, Mrs. Lewallen, what was wanted, was asked, "Is that what you want?" and responded, "Yes." The card thereupon signed by all three of these people. Mrs. Elmer Jansen then asked Fred Jansen, the father, "What will the rest of the kids think about this? And he replied, "It's none of their business." The last clause on the card signed, as above it will be observed, reads: *"It is especially agreed that withdrawals of funds by the survivor shall be binding upon us and upon our heirs, next of kin,* legatees, assigns *and personal representatives."* (Italics supplied.)

From what has been set forth above, it is apparent that the intestate orally twice intimated that the rest of the Jansen children as heirs other than Elmer were not to be concerned with the effect and contents of the signed card, neither was Fred Jansen's personal representative. In other words, the intestate both by oral words and writing made it plain to all concerned at the time of the transaction that the remaining heirs other than Elmer were not to interfere with what had been done at the Wyoming National Bank on September 21, 1951. In short, the controlling declarations on the bank card should not be disturbed. This clear establishment by uncontroverted proof of intestate's intentions should never have been questioned by Fred Jan-

sen's heirs or personal representative—which written and oral statements the trial court seems to have disregarded entirely. This action on its part was as it seems to us prejudicial error.

In 1 Am. Jur. 739, the text states:

"The intention of the parent, however, is the ruling consideration, and this intention must be ascertained from all the circumstances. * * * A transfer of money or property by a parent to a child in consideration of services by the latter, for which the parent is morally bound, is not an advancement. So, where it may be fairly inferred that the parent took this means to remunerate the child for benefits received from the child's services or earnings, or where the property transferred was regarded by the parent as belonging either legally, equitably, or morally to the child, the transfer will not be deemed an advancement."

It will be observed that at the time of the bank transaction hereinabove described the word "advancement" was never used and nothing appears disclosing that Fred Jansen, the intestate, thought or considered that he was disposing of a part of his estate. A reasonable compensation for what Elmer and Katharine, his wife, did for his father, Fred Jansen, relative to his properties in Casper would be, it seems, $7,130.37—as it was testified as far as we note without dispute.

It must not be overlooked that when Mrs. Katharine Jansen said to Elmer's father after the three had signed the card and he was preparing to return to his home in Nebraska, *"Don't you think you ought to take a check book along,"* the father replied, "No, if I need any money *you* can send it." (Italics supplied.) Briefly stated, the father apparently felt he was not relinquishing control over the joint deposit; but if he needed any money, all that he would have to do would be to ask Elmer and his wife for it. Dealing with them over a period of more than sixteen years had sufficiently con-

vinced him that he could do that. There are such children in the world—and fortunate for the world it is that that is so. The record discloses that some of Jansen's children were obviously not of that reliable type.

In Albers v. Young, 119 Colo. 37, 199 P. 2d 890, 892, the Supreme Court of Colorado said:

"It is argued that since there is no evidence in the record showing the intention of decedent, other than the fact of the creation of the joint account, the presumption that an advancement was intended is conclusive. This argument is based upon the erroneous assumption that the establishment of a joint bank account with the right of survivorship, ipso facto, constitutes a *gift* inter vivos. The assumption is contrary to our holding in Page v. Elwell, supra (81 Colo. 73, 81, 253 P. 1059, 1062), and to the definition of advancement therein approved by us, which provides that a gift is not an advancement unless it is 'perfect and irrevocable.' It is likewise in conflict with our pronouncements in Johnson v. Hilliard, 113 Colo. 548, 160 P. 2d 386, and Falbo v. United States National Bank, 116 Colo. 508, 181 P. 2d 1020, wherein the essential elements of gifts, inter vivos, are set forth. In Johnson v. Hilliard, supra (113 Colo. 548, 160 P. 2d 389), we said:

" 'The *surrender of the dominion or control,* in order to effect a valid gift inter vivos, includes the *parting* of *possession* and *relinquishment* of all *control,* both present and future, of the property to the extent that it is beyond the power of the donor to recall it. The *surrender* of *control* and *dominion* must be such that if the donor resumes control of the property without the consent of the donee, he will become a *trespasser* and *liable* to the *donee* as such. 38 C.J.S., Gifts, § 20 p. 799; 24 Am. Jur., p. 741, § 22.' (Italics supplied.)

"There is nothing in the stipulation of the parties, statute or record to indicate an intention on the part of Mr. Kuni to make a 'perfect and irrevocable gift'; that decedent 'irrevocably parted with his title'; that there was a 'passing of the complete title'; or that there had been a complete 'parting of possession and surrender by the donor of all control and dominion'

of the funds. On the contrary, decedent, by virtue of the statute, retained control of, and dominion over, the account, including the absolute right to withdraw all or any part of the funds at any time. It follows that the trial court erred in finding that an advancement was created.

"The judgment is reversed and the cause remanded for further proceedings in harmony herewith."

26 C.J.S. 1177 asserts that: "Deposits in a bank for children made by a parent in his own name as trustee for them, he drawing no part of the principal or interest but retaining the deposit books, are not advancements." Jansen did not retain the deposit books in the case at bar but left them with Mr. and Mrs. Elmer Jansen, husband and wife, under the circumstances mentioned above.

In re Wiese's Estate, 222 Iowa 935, 270 N.W. 380, 382, 383, an oft cited case, the court, carefully reviewing its previous decisions in which it quoted the views of the eminent jurist, Judge Deemer, said:

"In this case we have no evidence indicating that the parent intended the gift as an advancement, and that the amount given should be taken into account on the settlement of his estate, other than the bare presumption which arises from the making of the gift.

"The legal battle between the parties in this case is waged around the proposition as to how much or how strong the evidence must be to overcome this prima facie case that is made out. Judge Deemer in the Bissell Case, supra (120 Iowa 127, 94 N.W. 465, 466), states: 'Proper evidence of intention is always admissible, and but slight evidence is needed to overcome the presumption stated.' This slight evidence rule continued to be the rule in this state until the case, In re Estate of Barnes, 177 Iowa, page 122, 158 N.W. 754, 761, was handed down in June, 1916, and on page 143 of 177 Iowa, 158 N.W. 754 of said report the court said: 'The controlling element in determining whether a given transaction between a parent and his child will be con-

sidered an advancement, or only a gift, or perhaps a loan, or a transfer for a valuable consideration, is, as has been heretofore observed, the intention of the donor at the time of the transaction. The evidence to establish that intention must be drawn largely from the circumstances surrounding the persons interested at the time. And the circumstances surrounding the transaction, or in truth the mere gift by a parent to a child, may be such as to create a presumption of advancement. For the doctrine that a parent desires to distribute his estate equally among all his children is so strong that, in the absence of clear and convincing evidence to the contrary, it will be presumed that a parent, who during his lifetime makes a substantial gift to a child, intended such gift to be an advancement. 1 R.C.L. 668.' This last sentence was taken bodily from 1 R.C.L. The footnote in support of the text contains no Iowa citation. This statement in the last-cited case, announcing for the first time in this state what we will term the 'clear and convincing evidence rule' was reaffirmed in Re Estate of Sells, 197 Iowa, 696, 197 N.W. 922, 923, wherein the court said: 'The presumption is overcome only by clear and convincing evidence. In re Estate of Barnes, 177 Iowa, 122, 158 N.W. 754.' The rule is reiterated in 1 Am. Jur. 766, par. 116, citing the same line of cases that was cited in 1 R.C.L. 668, and in the footnote the following Iowa cases are cited in support of this principle: Woods v. Knotts, 196 Iowa, 544, 194 N.W. 953, 30 A.L.R. 768; In re Palmer's Estate, 194 Iowa, 611, 190 N.W. 30, 26 A.L.R. 1097; In re Barnes' Estate, 177 Iowa, 122, 158 N.W. 754. We have examined the case of Woods v. Knotts, supra, and it does not support the text. All that is said in the Knotts Case in reference to proof is quoted from the case of West v. Beck, 95 Iowa 520, 64 N.W. 599, 600, as follows: 'Now, advancement is an irrevocable gift made by a parent to a child in anticipation of such child's future share of the estate; and when a father pays off a debt owed by his son to a third person, the law presumes the money so paid is an advancement, unless it be shown that it was not so intended.' There is nothing here to indicate that the showing must be by clear and convincing proof. Neither does the case In re Palmer Estate, supra, support the text.

"In the case In re Manatt's Trust, 214 Iowa, 432, 239 N.W. 524, 526, the matter of advancements was again under consideration by our court, and after reviewing several cases, the opinion quotes from the case of Bissell, supra, the statement: 'But slight evidence is needed to overcome the presumption stated.' The writer of the opinion continues and says: 'It is apparent under these authorities that when a parent is shown to have turned over and delivered money to a child, *in the absence of all other showing,* it is presumed to be an advancement; but it takes slight evidence to overcome this presumption.' (Italics ours.) No mention is made in the Manatt's Trust Case of the case In re Estate of Barnes, supra, or the case In re Estate of Sells, supra. We thing the opinion in the Manatt's Trust Case announces a sound rule, namely: 'In the absence of all other showing, it is presumed to be an advancement,' that is to say, a prime facie case is made out, and as held by Justice Deemer in the Bissell Case, supra (120 Iowa, 127, 94 NW, 465), in the absence of evidence to the contrary, such gift will be treated as an advancement. *"We think it logically follows that if there is evidence to the contrary, pointing to a contrary intention, although such evidence be slight, the mere presumption must disappear in the light of such evidence to the contrary."* (Italics supplied.)

We are inclined to agree with the final conclusion of the Supreme Court of Iowa reiterated above.

Accordingly, we think that the district court was mistaken in its order appealed from here. We think in the case at bar also that the evidence against the sum of $6,211.91 being an advancement on the share of Elmer Jansen in the Jansen estate was not only slight but overwhelmingly against that conclusion so far as Fred Jansen's intention—the controlling factor —is concerned.

The judgment of the District Court of Natrona County should be reversed and the cause remanded for a correction of the final order pursuant to the views hereinabove set forth.

*Reversed and remanded to be framed in accordance with the views hereinabove expressed.*

BLUME, J., and HARNSBERGER, J., concur.

## ON PETITION FOR REHEARING.

An application for rehearing was filed in this case and was denied without Opinion on November 8, 1955.