No. 15,606.

FALBO *v.* UNITED STATES NATIONAL BANK AS EXECUTOR
ET AL.
(181 P. [2d] 1020)

Decided June 9, 1947.

Mr. F. E. DICKERSON, Mr. ANTHONY F. ZARLENGO, Mr. W. F. DWYER, for plaintiff in error.

Mr. WILLIAM F. SCOFIELD, Mr. E. B. UPTON, Mr. SIDNEY P. GODSMAN, for defendants in error.

*In Department.*

MR. JUSTICE HAYS delivered the opinion of the court.

UPON the 29th of April, 1942, Dominic Falbo executed his last will and testament, whereby he devised and bequeathed one-half of his property to his wife, Lucille Falbo, and "the other one-half" to his mother, Maria

Falbo. The United States National Bank was named as executor of the will. Shortly after the death of Dominic, Lucille and a representative of the inheritance tax department opened the safety deposit box of deceased in the First National Bank of Denver, and found, inter alia, an unsealed envelope containing currency in the sum of three thousand eight hundred and sixty dollars, upon which envelope was written "Lucille Falbo" and a pencilled notation $3860.00."

The executor asserts the money belongs to the estate, while Lucille, petitioner herein, contends it belongs to her by reason of an alleged gift from her deceased husband.

The pertinent facts in substance are as follows: Dominic Falbo and Lucille Falbo were married July 23, 1937; the former rented a safety deposit box August 12, 1938; January 17, 1942, both consulted lawyers for the purpose of obtaining legal advice in adjusting their financial difficulties; as a result of many conferences with the attorneys, it was agreed that Dominic should deed an undivided one-half interest in certain real estate to Lucille, and that both execute wills, whereby Lucille was to will one-half of her property to Dominic, and one-half to her daughter, and Dominic should will one-half of his property to Lucille, and one-half to his mother, Maria Falbo. This arrangement was consummated April 29, 1942. July 15, 1942, Dominic signed a deputy card at the First National Bank giving Lucille access to the safety deposit box above mentioned, as his deputy. This authorization continued in force until Dominic's death in December, 1942. Lucille never exercised the authority conferred upon her by the deputy card, nor did she open the box at any time, but Dominic went to, and opened it upon six separate occasions after he deputized Lucille, the last occasion being December 12, 1942. The safety deposit box was opened December 30, 1942, in the presence of Lucille and the representative of the inheritance tax department, as above mentioned; February 8, 1943, the

United States National Bank qualified as executor and assumed its duties under the will.

May 5, 1943, Lucille filed her verified petition in the county court of the City and County of Denver praying that, "An order enter herein authorizing and directing the executor * * * to set over to the petitioner, Lucille Falbo, a one-half (½) interest in" the mentioned three thousand eight hundred and sixty dollars and other property; the petition reciting, inter alia, "That at the time of the death of the decedent [Dominic] there was standing in the name of the decedent and the petitioner [Lucille] the following property": * * * $3,860.00 in currency in the safety deposit box, First National Bank, Denver, Colorado."

It was alleged also: "4. Your petitioner states that she is the owner in her own right of an *undivided one-half* (½) *interest* in and to the above property.

"5. That during her lifetime, she was employed and that the above property was accumulated by the joint savings of herself and the decedent and that, therefore, she is entitled to a one-half (½) interest in and to all of the above property."

In her amended petition, filed in the county court May 28, 1943, Lucille alleged under oath:

"Your petitioner states that she is the owner of Three Thousand Eight Hundred and Sixty ($3,860.00) dollars in currency, now located in the Safe Deposit box in the First National Bank in Denver, Colorado. That she acquired title to said property by virtue of a valid and executed gift of said property from her husband to her.

* * *

"Wherefore, your petitioner prays that an order enter herein authorizing and directing the executor in the above estate to set over to the petitioner, Lucille Falbo, as her own individual property, the sum of three thousand eight hundred and sixty dollars ($3,860.00) hereinabove mentioned. * * *"

In addition to the above facts and circumstances, Maria De Julio, daughter of Lucille by a former marriage, testified as follows: Q. Miss De Julio, do you know whether or not your father, Mr. Falbo, ever brought an amount of money to the house? A. Yes, I did. Q. When was that? A. I don't remember just when, but it was one night he came home, and he was just smiling, and he says, 'Lu,' he says, 'now that we have all the papers fixed and everything, I have some money I am giving you; and he took the money out of his pocket and held it in his hand and he says, 'I want you to get an envelope and put your name on it with your own handwriting, and I will put the money in that envelope and put it in the safety deposit box, so if anything should happen to me, everybody will know this money will belong to you.' Q. How long before your father died was this? A. About four or five months before. Q. Did this happen over at your mother's house? A. Yes, sir. Q. Were you living there with your mother and father at that time? A. Yes, sir. Q. How long had you been living there? A. Oh, close to a year, I think. Q. You say he had this money in his pocket? A. Yes, sir. Q. Do you know how much money there was? A. Well, he mentioned there was between three and four thousand dollars. Q. But you say the money was not counted by anybody? A. No, it wasn't counted. Q. Well, did he take the money out of his pocket? A. He took the money out of his pocket and put it in the envelope, and then put the money and the envelope in his pocket and said, 'I am going to put this in the safety deposit box." Q. You say he told your mother to put her name on the envelope? A. Yes, he did. Q. Did she put her name on the envelope before the money was put in, or afterwards? A. Before the money was put in. Q. Was it before or after he stated he was giving her this money? A. It was after. Q. After he made that statement? A. Yes. Q. Are you familiar with your mother's handwriting? A. I am. Q. I hand you petitioner's Exhibit B, and directing your attention to the

name of 'Lucille Falbo,' do you know whose handwriting that is? A. That is my mother's handwriting. Q. Is this the envelope he had that money in? A. Yes, it is. Q. Did you see your mother sign her name? A. Yes, sir. Q. Was your father there at the time? A. Yes, sir. Q. And that was signed in his presence? A. Yes, sir. Q. And was it after she signed her name on there that he put it back into his pocket? A. Yes, sir. Q. After he put the envelope with the money back in his pocket what statement did he make, if any? A. He said, 'I am going to put this in the safety deposit box, and if anything should happen to me, people will know this money belongs to you,' and he put it in his pocket. Q. Was there any further conversation about this after that took place? A. Two or three days after, or a few days after, he came home and he says, 'Well Lu, I have put the money in the safety deposit box, and I am going to give you the keys. I don't want to carry any keys with me, being I am gone with the truck every day, I might lose it, or something might happen,' he says, 'so you can get in the box just any time you wish, and whenever I want to get in the box,' he says, 'I will ask you for the key. Will you give it to me?' and my mother answered, 'Yes,' so he gave my mother the two keys to the box. Q. This was, you say, about two or three days after she had signed her name on this envelope? A. That is right. * * * Q. Did your mother take the keys when he handed them to her? A. Yes, she did. Q. Do you know whether or not he ever asked your mother for either of those keys? A. Yes, he did. I remember three of four times he asked my mother for the keys, and she gave them to him, and in the evening he returned the keys back to my mother. Q. Did you see him give her the key back? A. Yes, sir. Q. At the time your father handed your mother this money, was that before or after they had been to Mr. Spangler's office? A. It was after. Mr. Alter: She has not testified that her father handed her mother the money. Mr. Zarlengo: I will reframe the question: Q. At the time

your father put the money in the envelope and your mother signed the envelope at his request, was that before or after they had been up to Mr. Spangler's office? A. After. That was after. * * * Q. Without going into what you have said already, tell us anything in addition to that that he said. A. Anything else? Q. That is all he said about the money. Did he say anything else —why he was giving her this money? A. He said, 'Being you have given me everything you could—a good housekeeper, a good cook—I will never find another woman like you again,' he said, 'I am giving you this money. You helped me out, and I will help you out.' Q. This was all said at that same time, was it? A. Yes, sir."

On cross-examination the following occurred: Q. And then she gave the envelope to him and put the money in it and put it in his pocket? A. That is right. Q. Was the envelope sealed? A. No. Q. And that closed the incident that night— A. That night. Q. —according to your testimony? A. Yes. Q. The money was never given to your mother, and never left his hands? A. No. Q. Now, sometime subsequent to that—and I think you said two or three days—you have told this story about the keys to the safety deposit box. Where did he say the safety deposit box was? A. In the First National Bank. Q. Did he say that that night? A. No, he said it when he brought the keys home. Q. He said it when he brought the keys home? A. Yes. * * * Q. Now coming to the time when he brought the keys home and you say he gave them to your mother, what was that conversation, please? A. He said, 'Lu, I have put the money in the safety deposit box and here are the two keys to the box'; he said, 'I don't want to carry them with me because I am always going in the truck and I am liable to lose them'; he said, 'You can get into the box just any time you wish, and whenever I want to get in the box I will ask you for the keys. Will you give them to me?' and she said, 'Yes,' and he handed her the keys. Q. And she kept them for him? A. Yes. Q. And subsequently he

would tell her he would want to go into the box and she would give him the keys, and he would go down? A. That is right. Q. And you don't know what he did on those occasions any more than the time when you went with him? A. No. Q. How many times would you say, after your visit with Mr. Falbo to the Safety Deposit box, that he went there with these keys? A. As I recall, I think he asked mother for the keys three or four times. Q. That you know of? A. Yes."

Eventually the case was tried to a jury in the district court and at the close of the evidence a motion interposed by counsel for respondent for directed verdict was sustained, a verdict returned and judgment entered on the verdict in favor of the executor and against the petitioner, Lucille Falbo. To reverse that judgment, petitioner brings the cause here by writ of error. The sole and only question for determination is whether or not the trial court was justified, under the facts and circumstances related above, in finding that the alleged gift did not constitute a gift inter vivos.

■ We have many times held that the essential requirements of a gift inter vivos are a clear and unmistakable intention to make the gift, and the consummation of such intention by those acts which the law requires to divest the donor of, and invest the donee with, the right to the property, and that there must be a complete parting of possession and surrender by the donor of all control and dominion over the same. *Thomas v. Thomas,* 70 Colo. 29, 197 Pac. 243; *Hardy v. Carrington,* 87 Colo. 461, 288 Pac. 620; *Slagle v. Construction Progress Exposition,* 100 Colo. 292, 67 P. (2d) 623; *Johnson v. Hilliard,* 113 Colo. 548, 160 P. (2d) 386; *Nelson v. Spotts,* 114 Colo. 72, 162 P. (2d) 224.

In *Johnson v. Hilliard, supra,* we said: "The surrended of the dominion or control, in order to effect a valid gift inter vivos, includes the parting of possession and relinquishment of all control, both present and future, of the property to the extent that it is beyond the power

of the donor to recall it. The surrender of control and dominion must be such that if the donor resumes control of the property without the consent of the donee, he will become a trespasser and liable to the donee as such. 38 C. J. S., p. 799, §20; 24 Am. Jur., p. 741, §22."

Considering the above facts and circumstances in the light of the authorities above cited, we are of the opinion that the trial court was justified in finding, as a matter of law, that there did not exist in the mind of the deceased a clear and unmistakable intention to make the alleged gift.

It likewise is apparent, as the trial court found, that even if there had been a clear intention to make such gift, there has been no consummation thereof sufficient to divest the alleged donor of, and invest the alleged donee with, the property in accordance with the rulings in the above decisions. The petitioner never had possession of the money. The deceased at no time subsequent to the alleged gift surrendered complete dominion or control over the money. He kept it in his personal safety deposit box, which he opened upon six separate occasions, after deputizing Lucille, for the ostensible purpose of putting in, or taking out, money. Nothing was said at the time the money was placed in the envelope as to the amount thereof, it was not then counted, and no one knew how much was in it, except the deceased, until after his death.

In view of the original petition filed in the county court wherein claimant stated that she was the owner of only an undivided one-half interest in the money, it is impossible to reconcile such statement with that made by her under oath May, 1943, if her deceased husband, as she now claims, made an outright gift of all the money to her in July, 1942.

At the time the deceased told petitioner that he had placed the envelope in his safety deposit box with her name written thereon, and handed her the keys, he exacted from her a promise that she would surrender

the keys to him whenever he asked for them; his only reason for giving them to her to care for, being his fear of losing them while driving his truck.

It was within the power of Dominic to recall the alleged gift, or any part thereof, at any time he wished, without the knowledge or consent of the petitioner. We, therefore, conclude that the transaction here considered did not constitute a gift inter vivos.

The action of the trial court in directing a verdict and judgment in favor of the executor and against petitioner is accordingly affirmed.

MR. JUSTICE JACKSON and MR. JUSTICE LUXFORD concur.