376 P.2d 3

**In the Matter of the Last WILL and Testament of Leon E. WILLIAMS, Deceased.**

**Marietta Sinton GRAY, David W. Sinton, James H. Sinton and E. A. Bennett, Appellees,**

v.

**The ESTATE of Leon E. WILLIAMS and the Trustees of Dartmouth College, Residuary Legatee, Appellants.**

**No. 7026.**

Supreme Court of New Mexico.

Nov. 2, 1962.

John B. Wright, Raton, Love & Cole, Colorado Springs, Colo., for appellant Estate of Leon E. Williams.

Henry E. Blattman, Las Vegas, Rodey, Dickason, Sloan, Akin & Robb, William C. Briggs, Albuquerque, McLane, Carleton, Graf, Greene, & Brown, Manchester, N. H., for appellant Trustees of Dartmouth College, Residuary Legatee.

Kellahin & Fox, Santa Fe, Murray, Baker & Wendelken, Colorado Springs, Colo., for appellees

**42**

CASWELL S. NEAL, District Judge.

This is an appeal from a judgment of the district court of Mora County, sitting in probate, in the matter of the last will and testament of Leon E. Williams. The will was admitted to probate in the probate court of Mora County and John F. Meck and James H. Sinton were appointed co-executors. The case was transferred by appeal to the district court (§ 16–4–18, N.M.S.A. 1953). John F. Meck resigned as executor and was replaced by William C. Bates. The only clause in the will concerning the present appeal is paragraph SIXTH, which reads as follows:

"SIXTH: I give, devise and bequeath the following amounts to my sisters, nieces and nephews they surviving me as set forth below:

"To my sister, Lorraine W. Bennett, Fifty Thousand Dollars ($50,000.00).

"To my sister, Lucile W. McGee, Fifty Thousand Dollars ($50,000.00).

"To my nephew, James H. Sinton, Fifty Thousand Dollars ($50,000.00).

"To my nephew, Robert L. McGee, Fifty Thousand Dollars ($50,000.00).

"To my nephew, David W. Sinton, Fifty Thousand Dollars ($50,000.00).

"To my nephew, E. A. Bennett, Fifty Thousand Dollars ($50,000.00).

"To my niece, Marietta Sinton Gray, Fifty Thousand Dollars ($50,000.00).

"To my niece, Virginia Bennett Lawton, Fifty Thousand Dollars ($50,-000.00).

"To my niece, Betty Bennett Kemp, Fifty Thousand Dollars ($50,000.00).

"The above bequests shall be decreased by any gifts made by me during my lifetime subsequent to the date of the execution of this will to my nieces and nephews but not to my sisters."

The co-executors filed their final report and application for determination of heirship. Paragraph XI of the report recited the bequests contained in paragraph SIXTH of the will and, as to certain of these bequests, reported as follows:

"That in said WILL, the decedent, Leon E. Williams further provided that each of the above bequests be decreased by any gifts made by him during his lifetime subsequent to the date of the execution of said WILL to his nieces and nephews, but not to his sisters; that subsequent to the execution of said WILL, and during the lifetime of said decedent, the decedent made gifts to certain of said nieces, nephews, and their respective families, which gifts constitute advances to said nieces and nephews as follows:

"James H. Sinton, wife
and children ................ $19,887.50
"David W. Sinton, wife
and children ................ 39,000.00

"E. A. Bennett, wife and children      32,850.00

"Marietta Sinton Gray, husband and children      36,000.00

"Virginia Bennett Lawton and children      17,568.75

"Betty Bennett Kemp and daughter      11,612.50

and said bequests should be decreased accordingly;

"That pursuant to the terms of said WILL, the sum of $50,000.00 has been paid to each of the following:

"Lorraine W. Bennett

"Lucile W. McGee

"Robert L. McGee

"That pursuant to the terms of said WILL, the sum of $38,387.50 has been paid to Betty Bennett Kemp;

"That pursuant to the terms of said WILL, the sum of $32,431.25 has been paid to Virginia Bennett Lawton;

"That pursuant to the terms of said WILL, the sum of $30,112.50 was tendered to James H. Sinton and was refused;

"That pursuant to the terms of said WILL, the sum of $11,000.00 was tendered to David W. Sinton and was refused;

"That pursuant to the terms of said WILL, the sum of $17,150.00 was tendered to E. A. Bennett and was refused;

"That pursuant to the terms of said WILL, the sum of $14,000.00 was tendered to Marietta Sinton Gray, and was refused;

"That in signing and presenting this report as co-executors, James H. Sinton, in his individual capacity and as legatee, does not waive the right to object to the matters set forth in this paragraph."

Thereafter, David W. Sinton filed his objection to the final account setting forth the bequest to him of $50,000.00; admitting that subsequent to the date of the will decedent made a gift to him of securities of the value of no more than $2,850.00, and prayed for an order of the court requiring the executors to pay to him, after giving credit for the $2,850.00 received by him personally, the balance of $47,150.00, plus interest thereon from May 24, 1960, at 6 per cent.

James H. Sinton, individually and not as executor of the estate, filed his objection in substantially the same form, acknowledging that subsequent to the date of the will decedent made a gift of securities of the value of not more than $6,000.00, and praying for an order directing the payment to him personally of $44,000.00 of the $50,-000.00 bequest, plus interest.

E. A. Bennett filed a similar objection, acknowledging that subsequent to the date of the will decedent made a gift to him of

securities worth not more than $5,700.00 and seeking an order requiring the executors to pay to him personally an additional $44,300.00, plus interest. However, in his requested findings of fact, he admitted these securities were worth $6,000.00 and the court so found.

Marietta Sinton Gray filed her objection to the final account and report, acknowledging that subsequent to the date of the will the testator made a gift to her of securities worth not more than $5,700.00 and seeking an order requiring the executors to pay her personally an additional $44,300.00, plus interest.

Distribution of the remainder of the estate was made without objections from any of the other devisees under the will with the provision, nevertheless, that not less than $175,000.00 be retained by the co-executors to insure the payment of the sums sought by the objectors which might be allowed; and a final decree was entered approving the final account and report otherwise and determining heirship, but retaining jurisdiction to determine the issues raised by the objectors.

A hearing was held by the court and the residuary legatee, the Trustees of Dartmouth College, and the co-executors introduced witnesses who testified to conversations with the deceased regarding the bequests advancements and regarding the gifts to his nephews and nieces, including the objectors. The residuary legatee also introduced 29 documents as exhibits, consisting of letters to and from the decedent concerning his gifts to the nephews and nieces and their families; letters to his former classmates explaining his inter vivos and testamentary program, and an accounting schedule showing gifts or advances made after the execution of the will and prior to the testator's death, and notes and comments of the testator on copies of the will in his own handwriting, all of which will be hereinafter referred to. The court allowed the admission of the testimony over objections, subject, nevertheless, to its being later stricken should the court so rule. The estate and residuary legatee rested its case and the objectors, after being given an opportunity to proceed with their testimony, rested their cases without offering any testimony, written or oral. The testimony introduced therefore stands uncontradicted.

Requested findings of fact and conclusions of law were filed by the respective parties and after a hearing before the court upon the requested findings and conclusions the court reversed its earlier ruling, sustaining objections to the admission of the oral testimony, exhibits, letters, comments on the will and accounting schedule showing gifts and, in effect, struck all of the testimony entered in the case as inadmissible. Thereafter, the court filed its decision, consisting of the court's findings of fact and conclusions of law and at the same time en-

tered an order denying all findings and conclusions not included in the decision of the court to which the executors and residuary legatee filed their objections and exceptions. The findings and conclusions made by the court material hereto are as follows:

"3. That the decedent, Leon E. Williams, was a certified public accountant, thoroughly familiar in the field of federal taxation and thoroughly familiar with the provisions of the United States Statutes and regulations governing income and estate taxes. He was not an attorney at law.

"4. That the will dated April 10, 1958, was written by Leon E. Williams personally.

"5. That between April 10, 1958, and the date of his death, Leon E. Williams made gifts to the Objectors as follows:

| | |
|---|---|
| "James Sinton | $ 6,000.00 |
| "David Sinton | 2,850.00 |
| "Marietta Gray | 5,700.00 |
| "E. A. Bennett | 6,000.00 |
| "TOTAL | $20,550.00 |

"6. That under the terms of paragraph SIXTH of said last will and testament each of said Objectors, to-wit: MARIETTA SINTON GRAY, E. A. BENNETT, JAMES H. SINTON, and DAVID W. SINTON, were bequeathed the sum of $50,000, subject to the following provision:

" 'The above bequests shall be decreased by any gifts made by me during my lifetime subsequent to the date of the execution of this will to my nieces and nephews but not to my sisters.'

"7. That each of said Objectors is a niece or nephew of said decedent.

"8. That the Executors herein have failed and refused to pay over to Objectors herein the amount of said legacy, less the amount of gifts to the respective Objectors, all as provided in said will; and that Objectors, and each of them, have filed timely Objections to the final account and report of Executors herein and to said failure and refusal on the part of Executors.

"9. Gifts in various amounts were made by said decedent after the date of said last will and testament, to-wit: April 10, 1958, to various spouses and children of said Objectors.

"10. The evidence does not show an intent on the part of said decedent to decrease the respective legacies to said Objectors by reason of any gifts made by decedent to the respective spouses and children of said Objectors.

"11. That the Executors of said last will and testament should pay over to each of said Objectors the sum of $50,000 less only the amount of the gift to each respective Objector as hereinabove set forth.

"12. That payment to each of said Objectors as aforesaid was due and payable as of the entry of the final decree herein on May 24, 1960, and that all sums payable by said executors to said Objectors in this cause should carry interest at the rate of six percent (6%) per annum from May 24, 1960, until paid in full.

"As *CONCLUSIONS OF LAW*, the Court finds:

"1. That the Court has jurisdiction of the parties hereto and the subject matter hereof.

"2. That extrinsic evidence offered by Executors and Dartmouth College, as residuary legatee, is not admissible to vary, contradict or add to the terms of decedent's will, or to show a different intention on the part of decedent not disclosed by the language of the will.

"3. The evidence does not show an intent by decedent to adeem or decrease the legacies to said respective Objectors by virtue of gifts from decedent to children and spouses of the respective Objectors.

"4. Objectors are entitled to judgment against the Executors herein in the amounts hereinafter set forth opposite their respective names, to-wit:

"Marietta Sinton Gray      $44,300.00
"E. A. Bennett                     44,000.00
"James H. Sinton                 44,000.00
"David W. Sinton                 47,150.00

"5. Judgment herein should provide that the amounts to which Objectors are entitled from Executors should bear interest at the rate of six percent (6%) per annum from May 24, 1960, until paid in full.

"6. That Executors should bear all costs of subject proceedings."

Based on the decision of the court a judgment was entered in favor of the objectors in the following amounts:

Marietta Sinton Gray      $44,300.00
E. A. Bennett                     44,000.00
James H. Sinton                 44,000.00
David W. Sinton                 47,150.00

plus interest at six per cent from May 24, 1960. An appeal from this judgment was taken timely. A review of the facts of the case and of the testimony offered which was stricken indicates the following undisputed facts:

Leon E. Williams executed his will on April 10, 1958. He had no children and his nearest relatives at the time of the execution of the will, as well as at the time of his death, May 26, 1958, were his wife, Marjorie M. Williams, two sisters, Lorraine W. Bennett and Lucile W. McGee, and four nephews and three nieces, among which group the four objectors are included. Basically the will provided for a bequest of $400,000.00

to his wife, plus a life estate for his wife in certain real estate and a distribution of personal property to his wife; the bequests of $50,000.00 to each of his sisters, nieces and nephews in paragraph SIXTH above quoted; a bequest of $100,000.00 to Colorado College and the distribution of the residue of his estate to the Trustees of Dartmouth College. The deceased was a man of substantial property. The appraised value of his estate approximated three and one-half million dollars. He was not an attorney but was a public accountant, in fact, one of the foremost public accountants in the country, thoroughly versed in the field of federal taxation and thoroughly familiar with the provisions of the statutes of the United States and the rules and regulations adopted thereunder governing income and estate taxes. The will was written by him personally. After the execution of the will and before his death the decedent made gifts to the objectors, as follows:

| | |
|---|---|
| James Sinton | $6,000.00 |
| David Sinton | 2,850.00 |
| Marietta Sinton Gray | 5,700.00 |
| E. A. Bennett | 6,000.00 |

or a total of $20,550.00. In addition to these gifts, during the same period, he made gifts in various amounts to the spouses and children of the objectors with the result that between the execution of the will, on April 10, 1958, and the death of Mr. Williams, on May 26, 1958, he made the following gifts to the objectors and their families:

| | PERSONALLY | FAMILY | TOTAL |
|---|---|---|---|
| James Sinton | $6,000.00 | $ 13,887.50 | $ 19,887.50 |
| David Sinton | 2,850.00 | 36,150.00 | 39,000.00 |
| Marietta Sinton Gray | 5,700.00 | 30,300.00 | 36,000.00 |
| E. A. Bennett | 6,000.00 | 26,850.00 | 32,850.00 |
| TOTAL | $20,550.00 | $107,187.50 | $127,737.50 |

Turning now to the testimony and facts shown by the parol testimony and written exhibits later stricken. By stipulation all written exhibits introduced were received without objection as to authentication.

The testator, on the day of the execution of the will, April 10, 1958, told his attorney that it was his intent to make the gifts to the nephews and nieces and omit these bequests from a subsequent revision of the will, and this without paying any gift taxes; that he expected to have his gifts completed in 30 to 60 days and would make a new will with the bequests to his nephews and nieces left out. He wrote out on a slip of paper showing his attorney how he was going to do this and

thus avoid taxation. At this time the will had not been executed. Later, on the same day, the testator and his attorney, Mr. Wright, were present at a directors meeting in a Raton bank. At that time Mr. Williams took out of his coat several instruments and told the directors that this was his last will and testament and asked them to witness his signature to the will, and passed copies of the will around the table. On April 19, some nine days after the execution of the will, he again told Mr. Wright that the bequests in paragraph SIXTH would be taken care of shortly, at which time he would make a new will and all of the bequests in paragraph SIXTH would be out since he was going to take care of them. He advised his attorney that he had his schedules of gifts arranged in such a way that not only would they not pay an inheritance tax on the remainder but he would avoid any gift tax out of his estate. On May 9, 10, and 11, 1958, he reviewed in detail the provisions of his will with John H. Meck, the treasurer and vice president of Dartmouth College, and discussed the provisions of the will with him, paragraph by paragraph. At that time he read a part of a letter to Mr. Meck, which is in evidence, addressed to Eugene Bissell, who was a member of the 1915 class of Dartmouth College and a roommate of the testator during the four years they were undergraduates at the college. This letter, written by the testator, states, in part:

"I am giving my nephews and nieces $350,000.00 and including children, spouses and themselves there are 34 entities involved so I can pretty well clear this deal by the early part of 1959 without a gift tax. These will be final gifts because I will then have given my sisters and their children in excess of $1,000,000.00, which seems to me will be enough, and this does not include my mother and father or Dolly."

He further advised Mr. Meck that he was making final gifts to each of his nieces and nephews and that while he would leave the $50,000.00 bequests to his sisters in subsequent wills, he would eliminate the bequests to the nephews and nieces.

Mr. Meck further testified:

"Q And did he discuss at that time with you the program of giving with respect to these $50,000.00 amounts?

"A Yes, he did. And he said he was in the process of making these gifts. As I recall, some of them had already been completed or were in the works at that time. In connection with Robert McGee I remember his stating he had not made any gifts to Robert because he was not sure of Robert's residence, and also there had been a little difficulty in getting the names of the children. He told me he was ascertaining the names of the other children of the other nieces and nephews. He said he had been

writing to them to get the necessary information because he had to make these gifts in not to exceed $6,000.00 each. And being he and I both understand the tax implications of gift tax, that was about all that was said about that.

"Q   When you say the implications of gift tax, what do you mean?

"A   That is the maximum he could make in any year on a—that was the maximum amount he could make to any one person in any one year without incurring liability for the Federal gift tax.

"Q   And was this program which he outlined to you one that contemplated making these gifts without any tax consequences?

"A   That is correct.

"Q   Or, I should say, perhaps, tax payments?

"A   Without any tax payment, yes, by him.

"Q   By him. And on that basis, the gifts were being made to whom?

"A   They were being made to the seven nephews and nieces, to their spouses and to their children; and they were being made on the basis of each family being a single entity so that each family would receive a total of $50,-000.00 and no more." Mr. Meck further testified:

"Q   And in connection with these matters, what if any statements were made with respect to the annual gifts and the continuation of any further gifts?

"A   He stated very specifically that he wished to discontinue them, discontinue these annual gifts. He continually came back to the point that he had given the family a great amount of money. The figure he used was one million dollars or upwards; and that he felt that the results had not been what he had anticipated. And he felt in cleaning this matter up he ought to tell them the annual gifts were not going to continue, but that he was going to give them $50,000.00 and that would be the final gift to each family unit.

"Q   And this $50,000.00 gift he was going to give to each person, was that to be protected—strike that out. This $30,000.00 gift he was going to give each family, was that to be protected by a provision in the will?

"A   It was already in the will, and he said, 'As soon as I have completed these gifts, I will strike the provision from the new will, or rather, re-write the new will without this $50,000.C0 bequest included.' "

A few days before the will was executed the decedent wrote letters to each of his nieces and nephews in which he outlined a plan by which he could make the total gift

of $50,000.00 to the particular nephew or niece and the members of his family, including children, indicating just when the gifts could be made in order to give the full $50,000.00 to each family as quickly as possible but without incurring any gift tax. To these letters the objectors replied, expressing their appreciation of the plan, giving the names of their children and discussing the manner in which the gifts should be sent and indicating how they might be used. Estate's Exhibit 6-A dated April 9, 1958, was written by the decedent to James H. Sinton and his wife, Bobbie. Material parts of this letter are:

"I have been giving some thought to the annual gifts which I have been making to my various nephews and nieces and the problems of my estate. I have in my present will a bequest of $50,000.00 to each one. I have about decided to make a gift of $50,000.00 spread between several years and to eliminate the bequests from my will and the annual gifts. Since there are some 34 individuals involved and $350,000.00 such a plan does take careful thought. There are some disadvantages about annual gifts or allowances and future bequests. To anticipate them is unwise and one never knows when one will die. A bequest involves delay, possible litigation, heavy taxes, administration expenses and so forth. In any case, insofar as possible, I would like to get all of my obligations out of the way during my lifetime. Under the Colorado law it is possible for a minor to own securities (stocks and bonds) and realize income of $600.00 per year without the parent losing the dependency exemption. Also, as you know, in the event of the death of a minor the parents inherit any property which the minor may own. I can give $6000 a year to any one individual without a gift tax liability.

"The plan in the case of your family might work or be worked out somewhat as follows:

| | "1958 | 1959. | 1960 | Note |
|---|---|---|---|---|
| "Bobby | $6000 | $6000 | | —Some adjustment may be |
| "Jim | 6000 | 6000 | | necessary on account of |
| "Child (1) | 6000 | 6000 | 1000 | deferred payments and |
| "Child (2) | 6000 | 6000 | 1000 | between the various families. |
| "Totals | $24000 | $24000 | $2000 | |

"I can make the above gifts in cash or securities although I would be inclined to recommend securities particularly in the case of the boys. $13000 for each one should provide ample funds for their higher education. * *

I am leaving a substantial portion of my property to Dartmouth College. I will bring my will with me and discuss the will in detail with you. In the meantime you might give the gift plan some thought and give me the benefit of your suggestions and conclusions."

To this letter Mr. James H. Sinton replied (Estate's Exhibit 6–B):

"Dear Uncle Leon:

"First of all I wish to give thanks from all of us for your bequests. It comes at a time in life when expenses are high and we deeply appreciate it. Also I wish to thank you for your confidence in me by naming me as one of the Executors of your will. I will give the job my best.

"As to the distribution, I would like to get cash myself. I still owe the estate of Henry Luehring about that amount and I will get that obligation paid off. That would leave me owning about one-fourth of the Holland Dairy stock. It has an appraised value of $2,000,000.00. This alone will take care of us for the rest of our lives. Bobbie (James H. Sinton's wife.— court's parenthesis) would like securities and the same for the boys. The legal names are James Michael, Alan De Witt, Adele Davis."

To E. A. Bennett and his wife, Helen, the testator on April 9, 1958, wrote a letter,

the material parts of which are as follows (Estate's Exhibit 7–A):

"Dear Helen and Bill:

"I have been giving some thought to the annual gifts which I have been making and to the problems of my Estate. As you know I have seven nephews and nieces and I have in my present will a bequest of $50,000.00 to each one. It seems best for me to make gifts to each one of $50,000.00 and to eliminate the bequests and the annual gifts.

"All business is somewhat hazardous and the cattle business is particularly so. A prospective inheritance has some definite disadvantages because no one knows how long one will live and there are heavy taxes, administration expenses, delays, possible litigation and so forth. Also, for mature people allowances or annual gifts are not entirely satisfactory and the anticipation of an inheritance is generally unwise. It might never materialize and frequently disappointments result. Anyway I would like to get all of my obligations out of the way during my lifetime.

"It is true that gifts might be squandered but so could an inheritance. In any case the handling of money by others is beyond my control.

"Such a plan involves $350,000.00 and I believe there are some 34 separate in-

dividuals affected so it does take some careful thought.

"Therefore, I propose in 1958 and 1959 to give your family $50,000.00, eliminate the bequest and any further annual gifts. I would, however, continue the allowance for Lorraine and Lucile which at the present time are $6000 per year for each of them.

"In your case it would be necessary to spread the gift between two years on account of gift taxes and it might be worked out somewhat as follows:

|              | "1958    | 1959    |
|--------------|----------|---------|
| "Helen       | $ 6,000  | $ 1,000 |
| "Bill        | 6,000    | 1,000   |
| "Child (1)   | 6,000    | 3,000   |
| "Child (2)   | 6,000    | 3,000   |
| "Child (3)   | 6,000    | 3,000   |
| "Child (4)   | 6,000    | 3,000   |
| "Totals      | 36,000   | 14,000  |

"I am permitted to give $6,000 in any one year to any individual without tax.

"It might be necessary to make some adjustment on account of deferred payments and as the various families might be affected.

"In the State of Colorado it is possible for minors to own securities and unless cash is immediately needed I would think in great part the gift or gifts should be in securities (stocks and bonds). $9,000 with accumulations should provide ample funds for the higher education of each child. Also a minor is permitted to have income of $600 per year without the parent losing the exemption of $600 for the child's dependency. In case of the death of a minor, the parents inherit any property which the child may have.

"In case you have any questions please let me know and I will try to answer them. Also, I will appreciate any suggestions or criticisms which you might have. It will be necessary for me to have the full and legal name of each member of your family."

On April 12, E. A. Bennett and his wife replied as follows (Estate's Exhibit 7–C):

"Dear Leon:

"We received your letter yesterday and both have read it about a dozen times. Helen took a nap later and was afraid she had dreamed the whole thing —its nearly unbelievable.

"I can't imagine a more acceptable plan so far as my family is concerned than the one outlined by you. We are concerned in assuring the children's education ahead of all else. We would probably also want to satisfy the mortgage on our house which would enable us to save at least $150.00 a month without altering our present budget. Aside from this I believe it would —

wise for us to have the balance in securities.

"We certainly would like to see you on your trip through in whatever way your schedule would permit. I've been on vacation for two weeks while the mill is down, we went to Denver for 2 days but otherwise stayed at home.

"Helen wants some space also—

"Your letter arrived on my birthday and what a glorious surprise it was! I still have to pinch myself—I am so sure I must be dreaming. Our greatest aim in our lifetime was to send all the children to the best college we could afford. Now you have made it possible to send them all to the best college in whatever field they decide to enter. It is quite a challenge to us, now that we will be completely out of debt, to see how much money we can save by ourselves. Now we can find out how money makes money.

"Please do stop in Pueblo to see us. I am so anxious for Marjorie to see Laurel. Anyone would think she was my first baby, I love her so. All the children have had the mumps but all are fine now. If you are coming through in the evening I hope you can stay for the night. Laurel is a good baby, and I always get a sitter for the children when I entertain. In that way I get more time to visit. Thanks again—and I think your idea is terrific.

"Lots of love,
"/s/ Helen

"Not to overstress a visit from you, but I know we both would like to discuss with you the handling of this amount—I believe we should attempt to keep it as much as possible intact along with our future earnings for as long as possible. It provides the basis for security for us the rest of our lives.

"You asked for legal names of each of the family:

"Helen Marie Bennett
"Edgar Arthur Bennett $\Big\}$ Parents

"(1) Harry Carol Bennett
"(2) William Scott Bennett
"(3) Charles Robert Bennett
"(4) Laurel Helen Bennett $\Bigg\}$ Children

"I don't know if you would require age or not but the children are as above 11 yrs, 9 yrs. 4 yrs. 3 mos.

"Hope to see you soon—

"Love (s) Bill."

To David W. Sinton and his wife, Eleanor, the testator on April 7, 1958, wrote the following letter (Estate's Exhibit 8–A):

"Dear Eleanor and Dave,

"I have been giving some thought to the annual gifts which I have been making and to getting my Estate in better order, and I have about decided

to give each nephew and niece $50,000.-00 and discontinue the annual gifts and not attempt to leave them anything in my will. As you know I have seven nephews and nieces and with their husbands, wives and children there are some 34 people involved, in fact there are seven in your family. Also, it means $350,000 so such a program takes some time and planning.

"In order to save gift taxes it is desirable to make as many gifts as possible because I have in effect an exemption for gift tax purposes of $6000 each year for each individual. In your case the gifts might be worked out as follows:

|  | "1958 | 1959 |
|---|---|---|
| "Eleanor — | $ 6,000.00 | $ 2,000.00 |
| "Dave — | 3,000.00 | 6,000.00 |
| "Child (1) — | 6,000.00 |  |
| "Child (2) — | 6,000.00 |  |
| "Child (3) — | 6,000.00 |  |
| "Child (4) — | 6,000.00 |  |
| "Child (5) — | 6,000.00 |  |
| "Previous gift to Dave | 3,000.00 |  |
| "Totals | $42,000.00 | $ 8,000.00 |

"Gifts may be made in cash or securities (stocks or bonds) and if the cash is not immediately needed I would recommend gifts in securities. I presume you are now residents of New York and in New York State it is legal for minors to own stocks. Actually such stocks are carried in the name of the Father but the ownership is the childs.

"In the event of the death of a minor the parents inherit the property of the minor.

"In the case of your children a gift of $6000 to each child now would mean with accumulations enough for their college education possibly more.

"I think such a final gift would be better than annual gifts or the anticipation of a bequest at the time of my death. All business is somewhat hazardous and I might not have any estate at death, as there are administration expenses, taxes and so forth and sometimes considerable delay in the closing of an estate. There are also objections to allowances of any kind in the case of mature people and looking forward to an inheritance is sometimes bad and frequently disappointing. Anyway, I would like to meet all my obligations during my lifetime. Of course gifts may be squandered but there is nothing I can do about that— and bequests could also be wasted and frequently are.

"So if the above is agreeable to you I will try to put the above plan into effect as soon as possible. However I will need the full names of the children. Also, I would like to know if

cash or securities is desired and for each member of the family.

"It is probably unnecessary for me to state that the income must be accounted for but children can realize income under $600 per year and still qualify as dependents. So it is favorable for children under 18 or going to school to have income and for tax purposes.

"In case you have any questions do not hesitate to ask them and I will attempt to answer them. It is fairly simple but there are a number of legal and tax matters involved."

To this letter Mr. David W. Sinton replied on April 14, 1958 (Estate's Exhibit 8–B), as follows:

"Dear Uncle Leon

"Please forgive my delay in answering your most kind letter. I must admit I was considerably taken back by your most generous offer. Eleanor and I have never felt that you owed us an obligation or indeed any sort of consideration. We have, of course, been most happy to have benefited from your generosity but have never felt that this was inevitable or indeed even likely from year to year. I was indeed grateful to receive the check which you sent and am most happy to thank you for it.

"The specific proposal seems most generous to me. I would be anxious for the children to receive their gifts directly and for some arrangement to be made so that any accumulation of income derived from this gift should accrue to the individual child. I do not quite understand how this could occur except as with savings bonds—though I would rather see the money invested in good securities because the value of securities is more apt to reflect the true value of the dollar than any such fixed investment as bonds. If this could be done, the accumulated dividends and principle might be a much more sizeable sum than by any gift of cash or even U.S. Gov. bonds. I will stand advised by you who, of course, are much more aware of these possibilities than I am.

"I was considering asking for smaller stock denominations from the Sinton Dairy for the same purpose, so that the children would not have to liquidate to pay any taxes on this. I would believe that this might be blocked by putting the income of the child too high. Perhaps you might have a suggestion about this also.

"As for Eleanor & I, we wish to take any gift in securities for I believe this will be better than a straight cash which tends to be used up and not retained in a single sum. If we can pos-

sibly do so we would like to keep this amount of money in a whole unit against the time when we might have to use it (i. e. 'rainy days' or emergency (incls. etc.)

"In all these matters I would like to be guided by you for your knowledge and experience are so far greater than mine that I would feel very inadequate. I might also say that I am human and probably better off under a rigid & restricted use of any money—to relieve temptation.

"I think the ideas expressed in your letter are very right. I know that I have benefited a great deal by the move to N.Y., and by the opportunity to stand on my own feet. This has been most helpful. Unfortunately this move had to be undertaken during a period of relative economic distress but I am still quite happy and most pleased with my position which is very promising.

"We have made a bid and down payment on an old house located on a farm —the 'Elsie the Cow' farm, in East Schodack N. Y. We will have to do some remodelling but we will be able to move in by June 30. We would be most happy if you can visit us sometime in the future, if and when you come to N.Y.

"One final last remark. I hope that this does not mean that you are ill in anyway for I would be most distressed to hear of that.

"Eleanor & all the children send you their thanks and love. Remember us to Marjory & all the family."

The testator replied to Mr. David W. Sinton's letter as follows (Estate's Exhibit 8-C)·

"Thanks for your letter of April 14, 1958 and I will attempt to answer your questions. But first I need the full legal names of all of your family and I am inclined to think you sent me this information but for the life of me I can't find it. I have your letter but no names. I thought this information was on a separate sheet but I have either lost or misplaced it. We are moving slowly our office from Raton to Wagon Mound and I have been carrying papers and files between the two places.

"I believe you are now residents of the State of New York and in this state it is possible for a minor to own corporate stocks. I am enclosing a booklet which you may keep and which I believe will answer most of your questions.

"You can make a gift of the Sinton Dairy Company stock to the children if you wish and if you don't need the income. There is very little chance of the taxable income of the children be-

coming serious or that their tax rates will exceed your (including any income of Eleanor's reported on a joint return). Also, I am quite sure that such gifts by you would not create any gift tax liability.

"Probably a tax would sooner or later be *e*ffected by increasing the income of the children and reducing yours or eliminating any income from yours.

"Should I use the address of New Lebonon Center in view of the fact that you will soon be moving to East Schadock? Or should I use the address of the Albany Hospital? Possibly I should use the East Schadock address and you could request the Postmaster to forward your mail to your present address until you move.

"You will receive dividends from time to time for the children and possibly it would then be wise to open savings accounts for each child and accumulate enough funds to buy in their names more stock.

"I have recommended the following concern for such a purpose:

"First Federal Savings and Loan Association of Denver,

"3460 West 38th Ave., Denver, Colorado

"This association pays 4% interest, savings can be withdrawn any time, banking can be done by mail and each account is guaranteed to the extent of $10,000.00 by the Federal Deposit Insurance Corporation."

On May 16, 1958, Mr. David W. Sinton responded to this letter as follows (Estate's Exhibit 8–D):

"Dear Uncle Leon:

"Please pardon my failure to write immediately. I delayed first purposely because you had indicated you would be gone for 2 weeks. Then my work seemed to pile up and I was held up in my correspondence. We, of course, are most grateful for your repeated generosity and will be guided by your advice in this as in other matters. Letters for the present should be sent to Albany Hospital, Department of Neurology, Albany, New York. We have had some mail go astray in the small country post offices and so I think it would be best sent to me at the hospital. We will not be moving until the end of June, in any event, because of the school situation.

"The children's full names are:

"Herbert Michael Sinton, born Nov. 16, 1948

"David James Sinton, born July 24, 1950

"John Blatrick Sinton, born June 4, 1953

"Stephen Williams Sinton, born Nov. 15, 1954

"Our names:

"Eleanor Blatrick Sinton    Age 35

"David Williams Sinton      Age 33

"If you feel that current investment in stocks is uncertain as some people here apparently do—please be guided by your far superior knowledge of these matters. The only thing we want is to (1 preserve the gift in toto and add to it if possible. I feel the children should receive this as a specific legacy, as if it had been a bequest, *from you,* and would like to preserve it intact if at all possible."

On April 9, the testator wrote to Marietta Sinton Gray and her husband, John, as follows (Estate's Exhibit 9–A):

"I have been giving considerable thought to the annual gifts which I have been making and I have about come to the conclusion that I should adopt another plan and which I will outline below.

"I have in my current will a bequest to you of $50,000 and I am thinking of eliminating it and the annual gifts and make one gift or rather two gifts to your family.

"I can make gifts of $6000 a year to any individual without gift tax.

"There are several objections to annual gifts or allowances and the anticipation of an inheritance is very bad. It is true that gifts may be squandered or wasted and the same is true of an inheritance. In either case I would have no control over them. And if you cannot handle property now you will never be able to do so.

"It is possible under the laws of the State of Colorado for minors to own property although it should be noted that in the event of the death of a minor the parents inherit his or her property. Also a minor (under 18 years of age) or a child in school or college is permitted to realize taxable income of $600 without tax and the parents are still allowed the $600 dependency exemption or deduction.

"In the case of a bequest there are heavy taxes, administration expenses, delay, possible litigation and so forth and of course there may be no estate at all. Anyway what I would like to do is to clear up all of my obligations during my lifetime.

"April 18—1958

"You will note I started this letter sometime ago but we were hit with another heavy snowstorm (22 inches) then we had guests and then I had to

go to Roswell and that is the way time goes.

"The way the above plan would work out for your family would be somewhat as follows:

| | "1958 | 1959 |
|---|---|---|
| "Marietta | $ 6000.00 | $ 2000.00 |
| "John | 6000.00 | |
| "Child (1) | 6000.00 | 3000.00 |
| "Child (2) | 6000.00 | 3000.00 |
| "Child (3) | 6000.00 | 3000.00 |
| "Child (4) | 6000.00 | 3000.00 |
| "Totals | $36000.00 | $14000.00 |

"Of course the gifts could vary but the above will permit the completion of the deal in 1958 and the early part of 1959. Also the gifts could be made in cash or securities but I would strongly recommend securities particularly in the case of the children."

On May 6, 1958, testator wrote to Marietta Sinton Gray as follows (Estate's Exhibit 9–B):

"Dear Marietta,

"I am sorry to have to tell you that I lost the slip of paper on which you had carefully written out the names of the children. I may find it among my papers but I will appreciate it if you will again give me the names on this letter and return to me.

"It doesn't make any difference about the delay because the next dividend date, I believe is July 1st.

"Incidentally, I made a mistake about the name of Debby. I should think her full name should be Deborah Gray Crouch (?) not Deborah Sinton or S. Crouch." ·

To which Mrs. Gray responded on May 9, as follows:

"Dear Leon:—

"Here you are:—

"Deborah Gray Crouch—23 years

"John William Gray II—19 "

"David MacGregor Gray—15 "

"Marietta Taft Gray 13 "

"Johnny has finally decided on Oklahoma University for his college. We are satisfied that he will get the very best in his geophysical engineering *if* he applies himself. He will probably take a five-year course, so your gift to him was most welcome though we won't let him touch it until he has to. Leon, we told our children all. We decided it the wisest course. David (Mac) is a worrier and he was worrying about how much it was costing to educate him. He was greatly relieved, believe me, when he heard the money was there to be used when needed. Debby felt the same way. She still plans to teach next fall except for an 'act of God.'

"All our thanks again

"/s/ Marietta"

On May 16, Debby Crouch, a daughter of Marietta Sinton Gray, wrote the testator as follows (Estate's Exhibit 9–C):

"Dear Uncle Leon,

"Last week Eddie and I received a letter; the letter from Mother and Daddy telling us about your most generous gift. As I told the family, it is one of those things which makes one wonder what he has done to deserve such. We still haven't recovered from the surprise this has brought us and it will probably be some time before we do.

"What you have done for us,—Eddie, Little Debbie and I, is to give us a wonderful feeling of security because with several years still ahead of us with Eddie in Dental School, such a feeling is not often experienced. Little Debbie is the most important thing in our lives today and we are the proudest of parents, and as parents we want security for our little family. And this you have brought to us with your gift for which we are so (illegible) grateful.

"I told my parents that I only hoped I could make you realize how much we appreciate your kindness and generosity.

"To say thank you seems so inadequate, but we *do* thank you so very much and shall never forget what you have done for us."

Similar letters were written to the other nephews and nieces involved who have not protested the testator's actions. These appear as Estate's Exhibits Nos. 10, 11–A, 11–B, 11–C, 11–E, 12–A, 12–B, 12–C, 12–D and 12–E. These were introduced for the purpose of showing the intent of the testator to adeem the $50,000.00 gifts by making payments of $50,000.00 to each family unit; it is undisputed under the evidence that in the seven family units consisting of nephews and nieces and their spouses and children, there are 34 individuals and the undisputed testimony shows that by the means of dividing the $350,000.00 provided in the will for the seven nephews and nieces the testator intended to divide among them, 34 individuals consisting of seven family groups at $50,000.00 per family group.

It appears that on April 21, 1958, the decedent wrote his classmate, G. Kellogg Rose, a letter in which he enclosed a copy of the will, stating that the will with the notes attached would be self-explanatory. The letter contained the following information in the handwriting of the deceased relative to paragraph SIXTH. The slip attached reads as follows:

"SIXTH—I am making at this time gifts to my nephews and nieces and I will have them completed within the next 10 months and in great part. Actually I am ~~also~~ making gifts to them, their spouses and children some 34 in-

dividuals in all. This will eliminate $350,000.00 and with the exception of my sisters will be the end of gifts and future benefits to my family (not including Marjorie). Language can be improved and further clarification made."

It is noted that the word "also" written on the slip was stricken by the testator.

On April 22, 1958, the testator wrote to his classmate and former roommate, Eugene Bissell. The letter, in testator's own handwriting, states in part:

"I think your ideas are entirely sound and I believe our only difference might be in the course of procedure. I am sure our objectives are the same. First I would like to tell you my plan for the next ten months. I am giving my nephews and nieces $350,000.00 and including children, spouses and themselves there are 34 entities involved so I can pretty well clear this deal by the early part of 1959 without a gift tax."

Estate's Exhibit No. 13 reflects payments actually made between the date of the will on April 10, 1958, and his death on May 26, 1958, and the receipts of these payments were admitted by counsel for the objectors.

As hereinabove stated in the final account and report, the executors tendered to the four objectors and their families the difference between the total gifts to the objectors and their families the sum of $50,000.00, and in each case, as to the objectors, this was refused and the objectors filed their objections seeking payment of the difference between the amount received by the objector personally and $50,000.00, plus interest.

Three of the nephews and nieces declined to join with the objectors; namely, Robert L. McGee, Virginia Bennett Lawton and Betty Bennett Kemp.

Requested findings of fact of the executors and residuary legatee, clearly delineating this position, were submitted and were refused by the court.

It is the opinion of the court that the position of the appellants is supported by undisputed evidence if the parol and extrinsic evidence stricken by the court was admissible.

Appellants rely for a reversal of the Court's judgment upon two points, namely:

"POINT NO. I  THE EVIDENCE SHOWING WILLIAMS' INTENTION SHOULD NOT HAVE BEEN STRICKEN.
SECTION A  WHETHER OR NOT A GIFT CONSTITUTED AN ADEMPTION OF A LEGACY DEPENDS UPON THE DONOR'S INTENTION AT THE TIME THE GIFT IS MADE.

SECTION B  THE EVIDENCE SHOULD NOT HAVE BEEN STRICKEN.

"POINT NO. II THE COURT ERRED IN MAKING ITS FINDINGS OF FACT NUMBERED 10, 11 AND 12, AND ITS CONCLUSIONS OF LAW NUMBERED 2 TO 6 INCLUSIVE, AND IN REFUSING TO MAKE THE APPELLANTS' CONCLUSIONS OF LAW NUMBERED 1 THROUGH 4."

and under POINT III take the position that the court should, by its mandate, direct the lower court to enter judgment in favor of the executors and residuary legatee.

■ Turning to the point of whether extrinsic evidence is competent to show an intent to adeem. It cannot be denied that extrinsic evidence of the testator's intention to adeem is admissible, if not too remote and if not otherwise incompetent. In Page on Wills (Lifetime Ed.) Vol. 4, § 1539, the rule is thus announced:

"In most cases testator's intention with reference to ademption does not appear upon the face of the will, and, if it does, it relates to the future and it is possible that testator may change it. Accordingly, it is generally held that extrinsic evidence is admissible to show the intention which testator had when he made the payment in question. This includes parol evidence of testator's declarations, evidence of the surrounding facts and circumstances from which his intent may be inferred and evidence of testator's conduct. It has been said that ademption may be 'decreed as a matter of law upon admitted facts'; but this probably means nothing more than that ademption must be found as a fact if the evidence, as to testator's actual intention and as to surrounding circumstances, is undisputed.

"Parol evidence is admissible to rebut presumptions, whether in favor of ademption or against ademption. It is not admissible to contradict the intention of testator as manifest upon the face of the will. If the will shows testator's intention as to future payments, extrinsic evidence is admissible to show that testator had changed his intention."

■ Numerous cases supporting this eminent author are cited in the notes and in supplemental editions from year to year. Many of these cases are cited in appellants' brief. Indeed, this rule of law is not seriously controverted in objectors' brief. The element of the alleged remoteness of the testimony is raised. All of the transactions involved in this matter, and which are in evidence, took place between April 7, 1958, three days before the testator executed his will on April 10, and the date of the death of decedent, on May 26, 1958. It is true that evidence which is otherwise com-

etent may relate to facts too remote in point of time or matters too far removed from the scene of the transaction to be admissible. The admissibility of such evidence is a matter resting largely in the discretion of the trial court. It is inconceivable to this court that all of these matters, occurring within the short space of less than 50 days, make them too remote from the point of time to be inadmissible.

■■ It is true, as contended by appellees, that a declared intention to make a will does not operate as a revocation of an existing one. Appellees confuse the issue here involved. We are not here concerned with construction of the will of Leon E. Williams. The entire controversy before the court arises out of the gifts made by the testator after he made his will, on April 10, and before his death, on May 26, 1958. This controversy is here because the executors of the will took credit for gifts made to the legatees, their spouses and children after the execution of the will on the basis that the testator intended them to be credited on the several bequests. To this the objectors took exception and the litigation followed. Had deceased died before any gifts had ever been made, there would be no litigation and the objectors would have received their respective $50,000.00. All of the evidence in the case which was stricken was designed to prove the intent of the testator at the time the gifts were made and received and the law controlling here is

the law of ademption by satisfaction. It is admitted in appellees' brief that the authority of the Annotations at 94 A.L.R. 26 at page 192 permits extrinsic evidence to be admitted upon the question of ademption or to rebut a presumption of ademption.

■ The authorities treating the use of extrinsic evidence in construing a will such as those reviewed in 94 A.L.R. 26 are not in point here. We are not involved in a construction of the will. All of the gifts involved here are gifts made after the will had been executed and the only question involved is whether or not the $107,187.50 given to the spouses and children of the objectors constituted, in part, an ademption by satisfaction of the bequests in the will. This question is one of first impression in New Mexico. In Brown v. Heller, 1924, 30 N.M. 1, 227 P. 594, the doctrine of ademption was recognized by this court. However, the case dealt with ademption of a specific legacy by extinction rather than the question of ademption of a general legacy by satisfaction and the case has no application here. Again, in the case of Sylvanus v. Pruett, 1932, 36 N.M. 112, 9 P. 2d 142, the court discussed the doctrine of advancements and this doctrine is not here involved. Advancements should be confined to cases where the testator by will specifically directs that certain gifts already made by him be counted as advancement in equalizing the distribution of his

estate. There are numerous circumstances under which the law of ademption, originally a term of the Roman law, and now recognized by the common law, is applicable.

■ Ademption by satisfaction is the reduction or payment of a general legacy by actions of the testator subsequent to the will, by paying money or transferring property to the legatee or for the benefit of the legatee with the intent that the benefit conferred shall be applied on or substituted for the legacy. In Page on Wills (Lifetime Ed.) Vol. 4, § 1533, ademption by satisfaction is defined as follows:

"The doctrine of ademption by satisfaction applies only to the ademption of a bequest or legacy of personal property, by a gift made by testator during his life, to such legatee, as a satisfaction of such legacy. If it is shown that testator intended that such gift should satisfy the legacy, or if such intention is presumed from the relationship of the parties, the legacy is adeemed. * * * Since ademption is payment, and not revocation, the doctrine of ademption by satisfaction is not abolished by a statute which provides that a subsequent conveyance, and the like, shall not operate as a revocation, and that the will speaks as of the death of the testator."

Turning now to the question of whether the evidence showing Williams' intention at the time of making the respective gifts should have been stricken. We think not.

■ Whether or not the gifts constituted an ademption of the legacy depends upon the donor's intention at the time the gifts were made. The intention of the testator at the time the gifts were made is the controlling factor in ademption. The law is thus summarized in an annotation upon the subject in 26 A.L.R.2d 9, 18 (1952), wherein it is stated:

"The question whether a general legacy is adeemed by a transaction of gift, transfer or payment to the legatee, occurring subsequent to the execution of the will, is in all cases basically one of the intention of the testator in making the gift, transfer or payment."

It is unnecessary to review the many cases cited sustaining the foregoing proposition and the cases in general which we have reviewed proceed upon assumption of the correctness of the above quotation. In Page on Wills (Lifetime Ed.) Vol. 4, § 1536, it is stated:

"Whether a gift to a legatee operates as an ademption or not, depends upon the actual intention of the testator which he has at the time that he makes the gift, and which is communicated to the legatee, or would be inferred by the legatee from the circumstances un-

der which the gift is made, if he acted as a reasonable man. The doctrine of ademption by satisfaction is intended, primarily, to give effect to the intention of the testator; and not to secure the interests of other beneficiaries as against the wishes of the testator."

This author further states, § 1537:

"As between the time at which the will is made, and the time at which the payment which is claimed to be in satisfaction of a legacy, is made, it is testator's intention at the time of making the payment that controls."

■ It is also immaterial that the payment be made to some third person, as in this case, the spouses and children of the nieces and nephews. Page on Wills (Lifetime Ed.) Vol. 4, § 1548, states:

"If the payment is made for the benefit of the legatee, and if it eventually comes from testator's estate, the legacy is adeemed if such appears to be testator's intention from his declarations, or from surrounding circumstances; although the payment was not made directly by the testator to the legatee. This apparently gives effect to probable intention of testator that such payment shall apply upon such legacy."

■ In each case the objectors here have admitted the satisfaction by gifts to them personally by pro tanto ademption but deny the same as to gifts made to his or her spouse and children. Many cases support the theory quoted from Page, supra. See Anno. 26 A.L.R.2d at 109. In Grogan v. Ashe, 156 N.C. 286, 72 S.E. 372, the court held that a gift to the testator's niece's husband adeemed the niece's legacy. In re Smith's Estate, 210 Iowa 563, 231 N. W. 468, a transfer to a bank was held to adeem the legacy to the testator's son. In Mast's Appeal, 40 Pa. 24; In re Barne's Estate, 177 Iowa 122, 158 N.W. 754, and in Stichtenoth v. Toph, 10 Ohio Dec.Reprint 690, transfers to the testators' sons-in-law were held to have adeemed legacies to their daughters. Duff v. Duff's Executors, 146 Ky. 201, 142 S.W. 242, a transfer to the testator's grandson was held to have been an advancement to the testator's son. See, Note, 26 L.R.A.(N.S.) 1050. Further citations of authorities upon this point will operate only to incumber this opinion. The appellees seem to take the position that because in cases where the testator stands in loco parentis, a gift of amount equal to or greater than the legacy will be presumed to be an ademption of the legacy and a gift of less amount will be presumed to be a pro tanto ademption if the testator's plan of distribution will thus be carried into effect. Section 1541, Page on Wills (Lifetime Ed.) Vol. 4, asserts that no such presumption exists in regard to nieces and nephews, their spouses and children. This is undoubtedly true. However,

in this case the appellants do not rest their cases upon any presumption relating to the nieces and nephews or their families. If such a presumption even existed it could be overcome by proof because the presumption of ademption where a gift is made by one in loco parentis to the beneficiary is purely prima facie; and is also subject to being rebutted by showing that the testator intended such gift as a separate and additional gratuity—and not as satisfaction of the legacy. Vol. 4, Page on Wills (Lifetime Ed.), Sec. 1540, page 402.

In the Annotation at 94 A.L.R. 190, the annotator states:

"Some courts lay down the rule simply that since the question whether a gift by the testator to a legatee or devisee, after execution of a will works an ademption or satisfaction, depends upon the intention of the testator, his intention in this respect may be shown by extrinsic evidence."

Numerous cases are cited supporting this authority. On page 192 of the same annotation, the annotator states:

"However, other courts state the rule in somewhat different and more restricted form, viz., that the presumption of ademption of a legacy by a subsequent gift by the testator to a legatee may be rebutted by extrinsic evidence."

In this case the extrinsic evidence which was introduced was introduced for the purpose of showing the entire scheme or plan of the testator in making his gifts and his intention appears clear and plain and no presumption of ademption is a factor in this case.

It follows from the foregoing that the court erred in striking all of the evidence tending to show the intention of the testator in this case. This court has repeatedly held that a trial court may not ignore or disregard the unimpeached and uncontradicted evidence before it. Medler v. Henry, 44 N.M. 275, 101 P.2d 398; Morris v. Cartwright, 57 N.M. 328, 258 P.2d 719; Greenfield v. Bruskas, 41 N.M. 346, 68 P.2d 921.

From the foregoing it appears that the court erred in making its conclusion No. 2, in striking the extrinsic evidence and the parol testimony of Mr. Wright, the testator's attorney, and of Mr. Meck.

It further appears that the court erred in making its conclusion No. 3, that the evidence does not show an intent by the decedent to adeem or decrease the legacies to children and spouses of the respective objectors. Upon this question the undisputed evidence conclusively shows that the testator had his will prepared but not executed on the morning of the 10th day of April, when he talked to his attorney, Mr. Wright.

The will was written by the testator himself. It is extensive and indicates a great deal of thought in connection with the disposition of his estate. The testator was an especially smart business man and an expert accountant, fully familiar with all the laws and regulations relating to federal gift and inheritance taxes. Undoubtedly, on April 7, when he wrote his plan of distribution of his estate to his nephew, David W. Sinton, and on April 9, the day before he actually executed his will when he wrote the letters quoted above to James H. Sinton and his wife, E. A. Bennett and his wife and Marietta Sinton Gray and her husband, he had a plan by which he intended to give $350,000.00 of his estate to his seven nieces and nephews as a family unit, having in mind that this could be done for some thirty-four individuals consisting of the total number of nieces and nephews and their spouses and children. He explained the method by which he would make gifts of $50,000.00 to each family unit. He even set forth, in the case of each family of each objector, the plan which he would pursue in making the $50,000.00 gifts.

The objectors, by their replies, fully set forth not only their understanding of the testator's plan, but also that they understood that the gifts made to the spouses and children were to be applied to adeem the $50,000.00 bequests and that the $50,000.00 would be paid to each family as a family unit. It is not necessary that the testator should have used the word "adeem." The testator's intention is further clearly set out in a letter of April 21, to his classmate, Rose, in which he mailed a copy of the will with a slip attached in which he said:

"I am making at this time gifts to my nephews and nieces and I will have them completed within the next 10 months and in great part. Actually I am ~~also~~ making gifts to them, their spouses and children some 34 individuals in all. This will eliminate $350,-000.00 and with the exception of my sisters will be the end of gifts and future benefits to my family (not including Marjorie)."

The fact that the testator struck from the above the word "also" clearly shows his intention that the gifts were to be made to the nieces and nephews, their spouses and children to the extent of a total of $350,-000.00, or $50,000.00 to each of the seven family units consisting of the families of the nieces and nephews.

We have hereinabove quoted the contents of the letter in the testator's handwriting to his former roommate, Eugene Bissell, which clearly shows the testator's intent to make the gifts without a gift tax. It states in part:

"I am giving my nephews and nieces $350,000.00 and including children,

spouses and themselves there are 34 entities involved so I can pretty well clear this deal by the early part of 1959 without a gift tax."

Turning now to point II, namely:

"THE COURT ERRED IN MAKING ITS FINDINGS OF FACT NUMBERED 10, 11 AND 12, AND ITS CONCLUSIONS OF LAW NUMBERED 2 TO 6 INCLUSIVE, AND IN REFUSING TO MAKE THE APPELLANT'S FINDINGS OF FACT NUMBERED 6 THROUGH 20, AND APPELLANT'S CONCLUSIONS OF LAW NUMBERED 1 THROUGH 4."

From what we have heretofore said in this opinion, it is clear that the testimony introduced upon the part of the appellants and which was stricken by the court was admissible and should have been received and that the uncontradicted evidence discloses that the gifts to the spouses and children of the nieces and nephews show an intent upon the part of the testator to adeem the legacies in the will by all payments made to the nieces and nephews, their spouses and children.

From the foregoing it appears that the court erred in making its findings of fact numbered 10, 11 and 12 and its conclusions of law numbered 2 to 6, and erred in refusing to make the appellant's requested findings of fact numbered 6 through 20 and appellant's conclusions of law numbered 1 through 4.

Requested conclusion of law numbered 3 of the appellants reads as follows:

"That the objectors are estopped to deny that the gifts to their spouses and children were in ademption of the bequest contained in paragraph SIXTH of Leon E. Williams' will dated April 10, 1958. That the intent of Leon E. Williams at the time the gifts to the members of the objectors' families were made is controlling on the question of whether or not the same were in ademption of the bequest contained in paragraph SIXTH of the will."

The elements of equitable estoppel are well defined in New Mexico and are fully set forth in the case of Westerman v. City of Carlsbad, 55 N.M. 550, 237 P.2d 356, wherein the court states:

"The essential elements of an equitable estoppel as related to the party estopped are: (1) Conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation, that such conduct shall be acted upon by the other party;

(3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are:

(1) Lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially."

■■■ Each of the objectors knew the intention of the testator by letters received by them from the testator. They were invited to make any objections to the testator's plan which they wished to make. They made no objections. On the other hand, each of them wrote the testator, giving the names of their children to whom the gifts should be made, expressing thanks and delight at the testator's entire plan, realized and understood that he intended each family unit to have $50,000.00 and that he intended to make these payments to the nieces and nephews, their spouses and children, in such a manner as to avoid a gift tax on the bequests and to eliminate the amounts so paid from his estate from an inheritance tax standpoint. They accepted the payments which he made without objection, and certainly nothing upon their part in the lifetime of Leon E. Williams indicated any intention of any kind, upon their part, that they were not in full agreement and in accord and consented to his plan for the payment of the bequests. After the death of Leon E. Williams each of the objectors here have changed their positions. Suppose in his lifetime they had declined the gifts when they were made. This would have given testator an opportunity to change his will. On the other hand, by giving the names of their children to the testator and expressing delight at the gifts for the education of their children and expressing the manner in which they desired the gifts to be given, they undoubtedly led the testator to believe that they were in full and complete agreement with his plan. The element of reliance upon their failure to object is amply shown by the fact that Leon E. Williams made gifts of $107,187.50 to the families of the objectors other than the nieces and nephews after receipt of their letters expressing gratitude for his benevolence. Objectors have no right in equity to have accepted the gifts with full appreciation of what they were intended to do in the donor's lifetime, under donor's plan, and retracted their positions after his death.

■■■ Passing now to the question of whether or not the court should direct judgment in this case, it appears from the record that at the close of the case counsel for the objectors moved to strike the testimony introduced at the time counsel for the estate rested its case. The court thereupon requested the protestants (objectors) to proceed at that time and without introducing

any evidence in the case to contradict the undisputed evidence hereinabove set forth, the protestants rested their case.

In the light of our decisions the court is of the opinion that it should direct the judgment in this case. First National Bank of Clayton v. Harlan, 30 N.M. 356, 234 P. 305. We there stated:

> "The case stands here, just as it stood before the district court when the submission was made, and the court should have rendered the judgment then, which we have now directed. In such cases there can be no right to a new trial."

In the recent case of O'Rourke v. New Amsterdam Casualty Co., 68 N.M. 409, 362 P.2d 790, we said there:

> "Since no factual issue remains, the ends of justice will be better served by a mandate which will bring this litigation to an end and, under such circumstances, it is the province of this court to direct the entry of a proper judgment."

It is therefore ordered that the cause be reversed and remanded to the lower court with directions to set aside the judgment herein appealed from and enter a judgment in favor of James H. Sinton in the sum of $30,112.50; in favor of David W. Sinton in the sum of $11,000.00; to E. A. Bennett in the sum of $17,150.00, and to Marietta Sinton Gray in the sum of $14,-000.00. These amounts having been tendered to the objectors and refused by them, no interest will be added to the judgment. The cost, including the cost of this appeal, will be taxed against the objectors and appellees.

COMPTON, C. J., and MOISE and CHAVEZ, JJ., concur.